GOODELL, APPELLANT, *v.* JUDITH BASIN COUNTY ET AL., RESPONDENTS.

(No. 5,421.)

(Submitted March 11, 1924. Decided April 1, 1924.)

[224 Pac. 1110.]

*Elections—Absent Voters Law—Validity—Constitution—Statutes and Statutory Construction.*

Constitution—Statute—Validity—Presumption.
    1. Where the constitutionality of a statute is attacked on appeal, the supreme court will enter upon a consideration of the question indulging the presumption that the measure is a valid legislative enactment, the law-making department of the state government having plenary power, except in so far as it is abridged by the state Constitution or the supreme law of the land, which power will not be deemed circumscribed by mere implication.

Same—Statute—Invalidity—Burden on Appellant.
    2. He who attacks a statute as unconstitutional must be able to point out the particular provision which denies to the legislature the power which it assumed to assert, and unless its repugnance to the Constitution appears beyond a reasonable doubt it will be held valid.

Elections—Absent Voters Law—Constitutionality.
    3. *Held,* that the Absent Voters Law (Chap. 155, Laws 1917 [secs. 715–735, Rev. Codes 1921]) is a valid enactment and not open to the objection that in permitting a ballot to be delivered to the election officers by mail, it violates section 2 of Article IX of the state Constitution, the contention that the section, by providing that an elector shall have resided in the state one year immediately preceding the election "at which he offers to vote," impliedly requires his personal presence at the polls, not being tenable.

---

3. Effect of residential requirements of state law on constitutionality of Absentee Voters Law, see note in 14 A. L. R. 1260.

Appeal and Error—Decisions of Other Courts not Binding on Supreme Court.

4.   While the decision of the highest court of another state is entitled to respectful consideration, it is not binding upon the supreme court of this state, and is valuable to the extent only that its intrinsic weight and reasoning appeal to its judgment.

Elections—When Act of Voting Completed.

5.   Under section 703, Revised Codes of 1921, the act of voting is not completed until the ballot is deposited in the ballot-box.

Constitution—Rules of Construction Applicable.

6.   The same rules which govern the construction of statutes are applicable to the construction of Constitutions; hence the meaning and purpose of a section of the Constitution must be elicited from the terms employed therein if possible, having recourse to the ordinary rules of grammar.

Same—Nature of Instrument.

7.   The Constitution is not a strait-jacket but a living thing, designed to meet the needs of a progressive society and capable of being expanded to embrace more extensive relations.

Elections—Absent Voters Ballots—What Insufficient to Void Ballots.

8.   Section 4 of the Absent Voters Law requires the application for an absent voter's ballot to be accompanied by the affidavits of two registered electors of the precinct in which the absent voter resides identifying the applicant.   In an election absent voters' ballots were counted although the application in each instance was accompanied by the affidavit of only one resident elector of his precinct and by an affidavit of an elector residing in another precinct. *Held,* that it appearing that each of the voters was qualified and acted without fraudulent intent, the votes were properly counted.

Same—Election Laws—Provisions Directory After Election.

9.   *Held,* that while before election all the provisions of the election law are mandatory if enforcement is sought in a direct proceeding for that purpose, after election all should be held directory in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its omission shall render it void.

Same—Electors not to be Disfranchised by Acts of Election Officers.

10.   Under the rule that failure of an election officer to discharge his duty properly does not disfranchise an elector who in casting his ballot complied with the law, *held* that omission of the county clerk, in transmitting absent voters' ballots to the judges of election, to inclose the applications for such ballots to enable comparison of the signatures on the applications and the envelopes containing the ballots, was not a reason for rejecting the ballots, and that, after election, the requirement of section 727, Revised Codes, making it the duty of the judges of election to compare the signatures, will be deemed directory only.

*Appeal from District Court, Judith Basin County, in the Tenth Judicial District; W. E. Carroll, a Judge of the Second District, Presiding.*

ACTION by Homer T. Goodell against Judith Basin County and others, in which A. H. Moen intervened. From an adverse judgment, plaintiff appeals. Affirmed.

*Messrs. Gunn, Rasch & Hall, Mr. John J. Jewell* and *Mr. Herbert S. Woodward,* for Appellant, submitted an original and a reply brief; *Mr. Carl Rasch* argued the cause orally.

(Cases cited by counsel in support of as well as in opposition to the contention that the Absent Voters Law is unconstitutional are referred to in the opinion, and it is therefore deemed unnecessary to insert them here.)

If the Absent Voters Law is valid, then we insist that its provisions prescribing the means to obtain the privilege conferred are mandatory and strict compliance with them is required. (*Harrington* v. *Crichton,* 53 Mont. 393, 164 Pac. 537; *Corbett* v. *Bradley,* 7 Nev. 106; *Hurford* v. *City of Omaha,* 4 Neb. 336.)

Statutes creating or conferring new rights or privileges, the enjoyment of which is made to depend upon compliance with certain antecedent requirements, are universally held to be mandatory and strict compliance with the prescribed conditions is imperative. (*Cook* v. *Kelley,* 12 Abb. Pr. (N. Y.) 35; *M. H. Vestal Co.* v. *Robertson,* 277 Ill. 425, 115 N. E. 629; *Page* v. *New York Realty Co.,* 59 Mont. 305, 196 Pac. 871; 2 Sutherland on Statutory Construction, 2d ed., secs. 627, 632; *In re Van Noort* (N. J.), 85 Atl. 813; *Cusick's Appeal,* 136 Pa. St. 459, 10 L. R. A. 228, 20 Atl. 574; *Election of McDonough,* 105 Pa. St. 488; *United States* v. *Case of Hair Pencils,* 27 Fed. Cas. No. 15,924.) The principle is determinative here, and establishes the mandatory character of the provisions of the Absent Voters Law. (*Fitzmaurice* v. *Willis,* 20 N. D. 372, 127 N. W. 95; *In re Van Noort* (N. J.), 85 Atl. 813; *State* v. *Trask,* 135 Wis. 333, 115 N. M. 823; *Hope* v. *Flentge,* 140 Mo. 390, 47 L. R. A. 806, 41 S. W. 1002; see, also, *Straughan* v. *Meyers,* 268 Mo. 580, 187 S. W. 1159; *Smith* v. *Haworth,* 53 Mo. 89.)

It is insisted by respondent that the law should not be construed as appellant contends, because: "If there is one rule of universal acceptance in election law, it is that after the election nothing will serve to disfranchise the voter or avoid the election, unless it has capacity to affect the result." There is, of course, no gainsaying the fact that failure on the part of election officers to perform duties mandatorily imposed upon them has not been permitted, in many cases, to invalidate the election if objection is not made until after the election. But that principle has never been extended, nor has it ever been applied to a case like this where the statutory provisions are not merely mandatory but prohibitory as well. Nor has that principle been applied when the failure of compliance was that of the voter himself. The clearest exemplification of this is given in the Wyoming case of *Pratley* v. *State,* 17 Wyo. 371, 99 Pac. 116, cited by respondents. (See, also, *Slaymaker* v. *Phillips,* 5 Wyo. 453, 47 L. R. A. 842, 40 Pac. 971, 42 Pac. 1049; *People ex rel. Nichols* v. *Board of County Canvassers,* 129 N. Y. 395, 14 L. R. A. 624, 29 N. E. 327; *Kirkpatrick* v. *Board of Canvassers,* 53 W. Va. 275, 44 S. E. 465; *Sego* v. *Stoddard,* 136 Ind. 397, 22 L. R. A. 468, 36 N. E. 208; *Cramer's Election Case,* 248 Pa. St. 208, Ann. Cas. 1916E, 944, 93 Atl. 937; *Talcott* v. *Philbrick,* 59 Conn. 472, 10 L. R. A. 150, 20 Atl. 436.)

*Messrs. Templeman & Sanner, Mr. Earl Wineman, Mr. John B. Muzzy, Mr. Merle C. Groene* and *Messrs. Belden & De Kalb,* submitted a brief; *Mr. Sydney Sanner* argued the cause orally.

It is appellant's contention that the Absent Voters Law, if constitutional, is so mandatory in character and subject to such strict construction that after the election votes cast by qualified electors duly and legally registered must be stricken from the count if an irregularity, misprision or error occurred in the application for the ballots, or if in transmitting the ballots to the judges of election the county clerk fails to forward

with it the applications and supporting affidavits. In opposition to that contention we cite: *Lane* v. *Bailey,* 29 Mont. 343, 75 Pac. 191; *Harrington* v. *Crichton,* 53 Mont. 388, 164 Pac. 537; *Carwile* v. *Jones,* 38 Mont. 590, 101 Pac. 153; *Thompson* v. *Chapin,* 64 Mont. 376, 209 Pac. 1060.

Requirements which before the election may be viewed as mandatory will not be so regarded after the election. (9 R. C. L. 1093–1173.) And this is true even where the provisions of the statute impose a duty upon the elector; if he is a qualified voter and duly registered, and if his vote has been cast and received, it must be counted and cannot be rejected in a contest or other subsequent proceeding. (20 C. J., p. 88, sec. 66; p. 182, sec. 223; *Woodall* v. *Commissioners,* 176 N. C. 377, 97 S. E. 226; *Bryer* v. *Sevigney,* 42 R. I. 187, 106 Atl. 155; *Jones* v. *State,* 153 Ind. 440, 55 N. E. 299; *Clark* v. *Robinson,* 88 Ill. 498; *Pratley* v. *State,* 17 Wyo. 371, 99 Pac. 1116; *People* v. *Schum,* 102 Misc. Rep. 143, 168 N. Y. Supp. 391; *People* v. *Inspectors,* 102 Misc. Rep. 136, 168 N. Y. Supp. 398.)

The foregoing consideration applies with special force to the twelve absent voters' ballots from Dry Wolf precinct sought to be rejected as cast for Stanford. The criticism of these ballots is that none of them "was accompanied by the application of the person by whom said ballots had been voted as prescribed by section 3, nor by the affidavit of two resident and registered electors of said precinct as required by section 4 of the Absent Voters Law." Here certainly must be applied the rule announced in *Lane* v. *Bailey, supra,* for, by the terms of section 8 of the Absent Voters Law the inclosure of the absent voters' application is made the exclusive duty of the county clerk; and nowhere is it declared that failure to inclose such application with the ballot shall invalidate the vote. In this connection we are reminded of the vigorous declaration of the court in *State* v. *Fransham,* 19 Mont. 273. There the matter in question was of so high a character as the furnishing by the county clerk to the electorate of improper and misleading

ballots; yet the court declared: "A party or candidate may be defeated by an official's wrong, but the electors must be secure in the knowledge that their votes, when legally cast will be counted. And we cannot hold to the contrary, unless compelled to do so by mandatory provisions of law and construction requiring such votes to be held void, not in our Constitution or Codes." (See, also, *State* v. *Wolf*, 17 Or. 119, 20 Pac. 316; *Tazwell* v. *Davis*, 64 Or. 325, 130 Pac. 400; *Lehback* v. *Haines*, 54 N. J. L. 77, 23 Atl. 422; *Power* v. *Hamilton*, 22 N. D. 177, 132 N. W. 664, 665; *Pohlmann* v. *Patty*, 33 Cal. App. 390, 165 Pac. 447; *Huston* v. *Anderson*, 145 Cal. 320, 78 Pac. 626.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

At the general election held in Judith Basin county in November, 1920, the electors were called upon to express by ballot their choice of a place for permanent county seat. The rival candidates were the towns of Stanford and Hobson, and upon the face of the returns Stanford was successful. This action was instituted to secure a review and a judgment that Hobson had received the highest number of legal votes. Speaking broadly, the complaint charges fraud and the reception of illegal votes. The trial of the cause resulted in a judgment dismissing the complaint, and plaintiff appealed.

The findings made by the trial court are not challenged, but the conclusions drawn from the facts found furnish the grounds for the attacks made upon the judgment.

1. It is contended by plaintiff that the Absent Voters Law is unconstitutional; that ballots cast by electors, who were not personally present at the polls are illegal, and that, if such ballots be excluded, Hobson received a majority of the votes cast for permanent county seat.

The purpose of the Absent Voters Law (Chap. 155, Laws of 1917, now secs. 715 to 735, Revised Codes of 1921) is to afford

qualified electors who are unable to be present at the polls on election day an opportunity to exercise the elective franchise.

In entering upon a review of this case we indulge the presumption that the statute is a valid legislative enactment, for the rule is now too firmly established in this state to admit of further controversy, that the law-making department of our state government has plenary power, except in so far as it is abridged by the state Constitution or the supreme law of the land; that legislative authority will not be deemed to be circumscribed by mere implication; that he who attacks a statute as unconstitutional must be able to point out the particular provision which denies to the legislature the power which it has assumed to assert, and that a statute will not be declared unconstitutional unless its repugnance to the Constitution appears beyond reasonable doubt. [1, 2]

It is contended that the Absent Voters Law violates the provisions of section 2, Article IX, of our state Constitution, which, so far as involved here, reads as follows: "Every person of the age of twenty-one years or over, possessing the following qualifications, shall be entitled to vote  *  *  *  : First, he shall be a citizen of the United States; second, he shall have resided in this state one year immediately preceding the election at which he offers to vote, and in the town, county or precinct such time as may be prescribed by law." This section does not, in express terms, forbid the enactment of the statute in question, but counsel for plaintiff insist that the clause "at which he offers to vote" by necessary implication requires the personal presence of the elector at the polls and prohibits the enactment of a statute which authorizes the ballot to be delivered to the election officers by mail. The contention is grounded in the theory that the convention in drafting section 2, and the people in adopting it, intended to prescribe the place or manner of voting as well as the qualifications of the voter. [3]

Statutes having the same general purpose in view as the one before us are not new to the legislative history of this country. As early as 1813 the state of Pennsylvania adopted an absent voters law and during the Civil War period a like statute was enacted in each of several of the northern states to enable absent soldiers to vote. The constitutional question here presented was raised against some of those statutes, and the decided cases have all been called to our attention. Because of the different phraseology employed in the several state Constitutions, the construction placed upon one is of little assistance in determining the meaning of another. The Pennsylvania Act of 1813 was re-enacted in 1839, and its validity attacked in 1862. The Constitution of Pennsylvania, adopted in 1838 (Art. III, sec. 1) and then in force provided: "Every white freeman of the age of twenty-one years, having resided in this state one year, and in the election district where he offers to vote ten days immediately preceding such election, * * * shall enjoy the rights of the elector." The Pennsylvania court compared that provision with the provision upon the same subject found in the Constitution of 1790, reviewed the history of the legislation enacted to secure the purity of elections, and reached the conclusion that the clause "in the election district where he offers to vote" was inserted in the Constitution of 1838 designedly for the express purpose of making the precise place of voting an element of suffrage, and that a statute which authorized an elector to vote outside the state, and have his ballot transmitted to the state and counted therein, violated the provision of the Constitution quoted above. (*Chase* v. *Miller,* 41 Pa. St. 403.)

In *Bourland* v. *Hildreth,* 26 Cal. 161, decided in 1864, it was held that the Absent Voters Law of 1863 violated section 1 of Article II of the Constitution of California, which then provided: "Every white male citizen of the United States, * * * of the age of twenty-one years, who shall have been a resident of the state six months next pre-

ceding the election, and the county or district in which he claims his vote thirty-days, shall be entitled to vote." The clause "in which he claims his vote" was construed to require the personal presence of the elector at the polls.

In *People ex rel. Twitchell* v. *Blodgett,* 13 Mich. 127, decided in 1865, the Absent Voters Law of 1864 was held to violate the provisions of section 1, Article VII, of the Michigan Constitution, which reads as follows: "No citizen or inhabitant shall be an elector, or entitled to vote at any election, unless he shall be above the age of twenty-one years, and has resided in this state three months, and in the township or ward in which he offers to vote, ten days next preceding such election." The court laid great stress upon the fact that this section as it appeared in the Constitution of 1835 had been construed to prescribe "the place in which an elector may vote," by the legislature in proposing, and by the people in adopting, an amendment in 1838.

We are not called upon to express our approval of or dissent from the conclusion reached in each of the foregoing cases. Not one of them presents the precise question which confronts us. We observe, however, that in every instance the decision was by a divided court. Furthermore, the statute considered in each of those cases applied only to electors absent in military service, and authorized the commanding officers to open the polls at the military camps, wherever situated, and to conduct the election. In other words, the election precincts or districts were created and the act of voting was completed at the camps. The supreme court of Pennsylvania held, and we think properly, that the legislature could not create an election precinct outside of the state, and *a fortiori* could not authorize army officers to do so.

In his consideration of the Michigan statute, Judge Cooley observed: "There is no provision in this law anywhere that 'the soldier's vote shall be received and have effect in the township or ward of his residence.' The votes are never to be re-

turned to the township or ward.  *  *  *  The votes are canvassed by state, county and district canvassers, but never by township or ward canvassers."

In *Baldwin* v. *Trowbridge,* 2 Bartlett's Contested Election Cases, 46, the House of Representatives in 1866 held the Absent Voters Law of Michigan valid so far as it affected the election of representatives in Congress, and the people of Michigan thereafter amended their state Constitution so as to permit the character of legislation condemned in the *Blodgett Case.*

The decision in *Bourland* v. *Hildreth* was followed in *Day* v. *Jones,* 31 Cal. 261, decided in 1866.

Under constitutional provisions somewhat similar to those recited above, absent voters laws enacted in Wisconsin, Iowa and Ohio during the Civil War period were sustained against a like attack.  (*State ex rel. Chandler* v. *Main,* 16 Wis. 422 (1863) ; *Morrison* v. *Springer,* 15 Iowa, 304 (1863) ; *Lehman* v. *McBride,* 15 Ohio St. 573 (1863).)

The advisory opinions of the justices of the supreme court of Connecticut, New Hampshire, Rhode Island and Vermont (30 Conn. 591; 44 N. H. 633; 45 N. H. 595; [N. H.], 113 Atl. 293; 41 R. I. 118, 102 Atl. 913; 37 Vt. 665), considered constitutional provisions so vastly different from anything found in our state Constitution, that they do not reflect in the least upon the question now before us.  The Constitution of each of those states was drafted with reference to the peculiar New England system of elections at town meetings.

In 1898 the court of appeals of New York considered a statute which authorized a polling place to be established beyond the boundaries of an election district and permitted electors of the district to vote at such polling place.  The Constitution of New York then provided: "Every male citizen of the age of twenty-one years, who shall have been a citizen for ninety days, and an inhabitant of this state one year next preceding an election, and for the last four months a resident of the county and for the last thirty days a resident of the elec-

tion district in which he may offer his vote, shall be entitled to vote at such election in the election district of which he shall at the time be a resident, and not elsewhere." The statute was held to be valid, and concerning it the court, in part, said: "There is nothing in the Constitution that requires the voter, when offering his vote, to stand on the soil embraced within the boundary lines of the district, or that prohibits the legislature from making a room or building in an adjoining district a part of the district where the voter resides for the purpose of registering and casting his vote." (*People* v. *Carson*, 155 N. Y. 491, 50 N. E. 292.)

Absent Voters Laws of recent enactment are now in force in more than thirty states of the Union. The Missouri Act was assailed upon the ground that it conflicts with the provisions of section 2, Article VIII, of the Constitution of that state, which provides that an elector "shall have resided in the county, city or town where he shall offer to vote at least sixty days immediately preceding the election." Likewise it was contended that an absent voters law was prohibited by the language of section 2, Article VI, of the Constitution of North Carolina, which reads as follows: "He [the elector] shall have resided in the state of North Carolina for two years, in the county six months, and in the precinct, ward or other election district, in which he offers to vote, four months next preceding the election." In each instance the statute was upheld. (*Straughan* v. *Meyers*, 268 Mo. 580, 187 S. W. 1159; *Jenkins* v. *Board of Elections*, 180 N. C. 169, 14 A. L. R. 1247, 104 S. E. 346.)

The difference in phraseology employed in the several provisions considered in the cases above may account to some extent for the different conclusions reached; but if it can be said that the difference between any one of them and our section 2, Article IX, is a difference of form of expression, rather than [4] substance, we reply that the decision of the highest court of another state is not binding upon us. It is entitled to respectful consideration and is valuable to the extent only that

its intrinsic weight and the reasoning of the opinion appeal to our judgment. This court must assume the responsibility for the construction to be placed upon any provision of our state Constitution.

Chapter 155, above, is not open to the objections which were urged against the Absent Voters Acts of the Civil War period. It is general in its terms and provides all the safeguards necessary to secure a secret ballot and an honest expression of the elector's choice. It does not undertake to create election precincts outside of this state or to authorize an elector to vote outside the precinct of his residence; but it does provide a simple and convenient method by which he may vote in his home precinct though absent in person from the polling place. It provides that the qualified elector who is duly registered and who expects to be absent from the county of his residence on election day, may in advance receive from the county clerk an official ballot. He must then make the required affidavit, mark his ballot, place it in the envelope provided for that purpose, securely seal the envelope, subscribe the affidavit printed upon the envelope, have the officer before whom he makes the affidavit, subscribe the certificate also printed upon the envelope and the ballot is then transmitted by mail to the county clerk, who sends it with the elector's application to the judges of election of the elector's precinct. On election day the judges of election remove the ballot from the envelope, detach the stub, and deposit the ballot in the ballot-box. Ample means are provided for identifying the elector, whose right to vote is subject to challenge as in the case of an elector personally present. It will be observed that our Act is not open to the criticism offered by the justices of the supreme court of New Hampshire (113 Atl. 293) that the elector parts with all control over his ballot and has in fact voted when the ballot is marked and deposited in the mail addressed to the proper election officer. Our general election laws (secs. 700–703, Rev. Codes 1921) provide that when a ballot is tendered to the judges of election by an

elector found qualified to vote, they must detach the stub and deposit the ballot in the ballot-box; and further "When the ballot has been placed in the [ballot] box, one of the judges [5] must write the word 'Voted' opposite the number of the person on the check list for the precinct." (Sec. 703.) Under this statute and under the authorities generally, the act of voting is not completed until the ballot is deposited in the ballot-box (*State ex rel. Runge* v. *Anderson*, 100 Wis. 523, 42 L. R. A. 239, 76 N. W. 482; *State* v. *Custer*, 28 R. I. 222, 66 Atl.. 306). If an elector who has marked and transmitted his ballot before election day, appears at the polls before his absent voter's ballot has been deposited in the ballot-box, he may vote in person the ballot he has already marked, or he may demand a new ballot and use it. In other words, the Act in question merely constitutes the United States mail, the county clerk, and the judges of election the means by which a qualified and registered absent elector tenders his ballot for deposit in the ballot-box.

The question then recurs: Does section 2, Article IX, prohibit the legislature enacting a statute which permits a tender made in this manner, or does it by necessary implication require the elector himself to make manual delivery of his ballot to the judges of election? The section does prescribe minimum age, citizenship, and residence as necessary qualifications of an elector, and, if it undertakes to fix the place or manner of voting, the requirement is to be found in the clause "at which he offers to vote." It must be conceded that qualifications to vote, and place or manner of voting, are not homogeneous. The terms involve essentially unrelated ideas. Standing alone, the clause "at which he offers to vote" is meaningless, and it acquires meaning only by association with the context. Aside from that clause there is not anything in the entire Constitution which suggests an intention on the part of the framers to prescribe the time or place for holding elections or the manner in which they shall be conducted or the votes cast. In the schedule

attached to the Constitution, provision was made for the first election, but the provision spent its force as soon as that election was held.   In order, then, to hold that the clause "at which he offers to vote" was intended to fix the place or describe the manner of voting, we must assume that the learned men who drafted section 2, stopped short in the very midst of defining the qualifications of an elector and injected an idea of an entirely different character; but no one familiar with the rudiments of English would undertake to define qualifications and place or manner of voting, by the use of the language employed in section 2 [6]   above.   The same rules which govern the construction of statutes are applicable to the construction of Constitutions (*State ex rel. Gleason* v. *Stewart,* 57 Mont. 397, 188 Pac. 904); and the meaning and purpose of section 2 are to be elicited from the terms employed therein, if possible, calling to our aid the ordinary rules of grammar (*State* v. *Centennial Brewing Co.,* 55 Mont. 500, 179 Pac. 296).   The clause "at which he offers to vote" is used as an adjective and modifies the noun "election."   It describes a particular election, and thereby fixes a definite point of time from which the residential period is to be computed.   The provision of section 2 would mean the same thing if it read: He shall have resided in this state one year immediately preceding the election at which he votes. The debates of the Constitutional Convention disclose that there was not any discussion whatever of the clause now under review.

In some of the early decisions referred to above it was evidently considered a cogent reason for holding absent voters laws invalid that at the time the Constitution considered was adopted, the only recognized methods of voting were *viva voce,* a showing of hands, a division, or the manual delivery of a ballot to the proper election officials.   If that be an argument, it is not available in this instance, for absent voters laws were in effect in some of the states at the time our Constitution was adopted.   But to our minds it is not an admissible argument.

[7]  A Constitution is not a strait-jacket, but a living thing designed to meet the needs of a progressive society and capable of being expanded to embrace more extensive relations. (*State ex rel. Fenner* v. *Keating,* 53 Mont. 371, 163 Pac. 1156.) It is designed for popular judgment, and, owing its existence to popular approval, the language employed should receive a construction consistent with plain, common sense. It is our conclusion that section 2, Article IX, defines the qualifications of an elector and does not do more.

From the fact that an elector is guaranteed qualified immunity from arrest in going to, attending and returning from an election (sec. 4, Art. IX), no inference can be drawn that the Constitution requires the personal presence of the elector at the polls and forbids the enactment of an absent voters law. Of course, if the elector attends in person he enjoys the immunity, but, if he does not, the provision has no application to him.  A somewhat similar immunity is extended to witnesses by section 10676, Revised Codes of 1921; but no one would have the temerity to suggest that this section by necessary implication requires the personal presence of a witness in court, and forbids the use of depositions or affidavits in proper cases.

We think the absent voters law is not open to any of the objections urged against it.

2. It is contended next that, even though the statute be [8]  upheld as a valid legislative enactment, its provisions were so far disregarded that many votes cast by absent voters should not have been counted.  The trial court found that absent voters' ballots were cast as follows: In precinct 38, thirteen; in precinct 38½, thirteen, and in Arrow Creek precinct, four; that in every instance the elector's application for a ballot was accompanied by the affidavit of only one resident elector of his precinct, together with the affidavit of a resident elector of another precinct, but, notwithstanding the finding, the court concluded that twenty-nine of the votes should be counted, since every one of the voters, excepting one, was a

qualified and registered elector and acted without fraudulent intent.

Section 4 of Chapter 155 (sec. 718, Rev. Codes) requires the application for an absent voters ballot to be accompanied by the affidavit of each of two resident registered electors of the precinct in which the absent voter resides, to the effect that the affiant knows the applicant, that the person whose signature is appended to the application is the applicant, and that the applicant resides in said precinct. It is contended by plaintiff that this statute creates a new right or privilege not theretofore recognized or existing, that it directs that the ballot may be secured only in a prescribed manner, and that compliance with the precedent conditions is indispensable to the use of the ballot. In other words, it is contended that the statute is mandatory, and that a failure upon the part of the elector to comply with its terms renders his vote illegal.

We do not agree that the statute creates any new right. It merely provides the means for facilitating the exercise of the right which the elector has in virtue of his qualifications as an elector. The manifest purpose of requiring the affidavit of each of two registered electors of the same precinct as the applicant is to furnish the county clerk evidence of the applicant's identity and place of residence, and thus prevent an official ballot for a given precinct falling into the hands of anyone who is not entitled to use it. We say that the affidavit is for the enlightenment and protection of the county clerk; and this must be so, for as soon as the ballot is issued it ceases to perform any function whatever. It is indisputable that without the full measure of evidence which the statute prescribes, the county clerk could not be compelled by *mandamus,* or otherwise, to furnish the ballot; but, if he acts upon less evidence than the statute prescribes and furnishes the ballot, and the applicant is in fact a qualified and registered elector of the precinct for which the ballot is issued, and he casts the ballot in good faith and in all other respects complies with the letter

as well as the spirit of the law, shall his vote be rejected because the clerk should have required, and he should have furnished, further evidence before the ballot was issued? To emphasize the point let us assume that an applicant for an absent voters ballot presents the proper application, signed by himself and duly verified by his two nearest neighbors, each of whom solemnly swears that he is a resident and registered elector of the same precinct as the applicant. Upon this evidence the county clerk issues the ballot, and by means of it the applicant, who is a duly qualified and registered elector, votes. After the election it is ascertained that one of the affiants lives just over the line and in another precinct, but that he and the applicant acted under an honest mistake as to the exact location of the boundary line and believed the statement contained in the affidavit to be true. Now, if all concerned acted in the utmost good faith, does public policy demand that the ballot be rejected and the elector disfranchised because of the irregularity which unwittingly crept into the proceedings by which the ballot was obtained? Of course, if the statute declares that a ballot so obtained shall be illegal, there is no room for argument (*Harrington* v. *Crichton,* 53 Mont. 388, 164 Pac. 537; *Thompson* v. *Chapin,* 64 Mont. 376, 209 Pac. 1060); but the Act in question makes no such declaration. It goes no further than to say that, until the affidavit of each of two resident registered electors of the same precinct as the applicant is furnished, the application "shall not be deemed complete."

The like question has arisen in other jurisdictions. A statute of Illinois provided "that no vote shall be received at any state election, if the name of the person offering to vote be not on the register, unless such person shall furnish to the judges of the election his affidavit that he is an inhabitant of the district and entitled to vote therein, and prove, by the oath of a householder and registered voter of the district, that he knows such person to be an inhabitant of the district." At an election ballots were cast by electors not registered, and the

identifying affidavits furnished were not made by "householders and registered voters of the district." In a contest of the election these ballots were challenged, but the court held that the statute was directory "and that failure of observance of its direction would not invalidate a vote which had been received by the judges of election as sufficient, and deposited in the ballot-box." (*Clark* v. *Robinson*, 88 Ill. 498.) The same construction was placed upon a like statute, in *Bryer* v. *Sevigney*, 42 R. I. 187, 106 Atl. 155. On the contrary, a similar statutory provision was held to be mandatory and a vote cast in disregard of it declared illegal in *State ex rel. Doerflinger* v. *Hilmantel*, 21 Wis. 574; and the same statute adopted by North Dakota was given the same construction, in *Fitzmaurice* v. *Willis*, 20 N. D. 372, 127 N. W. 95.

It is impossible to reconcile these conflicting decisions, and no useful purpose would be served by an attempt to differentiate between mandatory and directory statutes. In *Price* v. *Lush*, 10 Mont. 61, 9 L. R. A. 467, 24 Pac. 749, decided in 1890, this court held that the provisions of the Act of March 13, 1889 (the Australian Ballot Law [Laws 1889, p. 135]) were mandatory and that informalities in the nomination of a candidate for office vitiated his election. The effect of that decision was to disfranchise the electors who had voted for Lush and to determine an election contrary to the will of the majority of the electors. The decision was practically overruled in *Stackpole* v. *Hallahan*, 16 Mont. 40, 28 L. R. A. 502, 40 Pac. 80, and since 1895 this court has adhered consistently to the doctrine that the purpose of our election laws is to secure to every qualified voter the right to cast an honest ballot and have it counted as cast; that any arrangement made by law to encourage the exercise of that right will not be nullified by the courts unless the arguments against it are so clear and convincing as to be unanswerable; that a ballot will never be vitiated by anything which is not clearly within the prohibiting words and meaning of the statute; and that an elector should not be de-

prived of his vote through mere inference, but only upon the
[9] clear expression of the law. In harmony with that doc-
trine we adopt the rule announced by the supreme court of In-
diana, in *Jones* v. *State ex rel. Wilson,* 153 Ind. 440, 451, 55
N. E. 229; "All provisions of the election law are mandatory
if enforcement is sought before election in a direct proceeding
for that purpose; but, after election, all should be held direc-
tory only, in support of the result, unless of a character to
effect an obstruction to the free and intelligent casting of the
vote, or to the ascertainment of the result, or unless the provi-
sions affect an essential element of the election, or unless it is
expressly declared by the statute that the particular act is
essential to the validity of an election, or that its omission shall
render it void."

3. The trial court found that twelve ballots were cast in Dry
[10] Wolf precinct in favor of Stanford by electors who were
not personally present at the polls; that when the envelopes
containing these absent voters ballots were received by the
judges of election, not one of them was accompanied by the
elector's application for his ballot. The court found further
that every one of the ballots was cast by a duly qualified
registered elector of the precinct, and that there was not any
element of fraud present. Upon these findings the court con-
cluded that the ballots were properly counted, and the cor-
rectness of that conclusion is now called in question.

Chapter 155, above, provides that when an envelope contain-
ing an absent voter's ballot is returned to the county clerk by
the elector, the clerk shall inclose the same unopened with the
elector's application for the ballot in a larger envelope (sec.
722, Rev. Codes), which shall be delivered to the judge of
election of the proper precinct to whom the official ballots are
delivered (sec. 723); that on election day the judges of election
shall first open the outer envelope and compare the signature
on the application with the signature on the inner envelope,
and if the signatures do not correspond "such vote shall not

be allowed,'' but the inner envelope, without being opened shall be marked ''Rejected.'' If the signatures do correspond, the judges shall then open the inner envelope, make the proper indorsement, detach the stub, and deposit the ballot in the ballot-box. (Sec. 727.)

It is the contention of plaintiff that since the comparison of the signatures could not be made, the judges of election erred in depositing these twelve ballots in the ballot-box, and that they should be rejected. This contention presents fairly the question: Are these twelve duly qualified electors, each of whom complied with the very letter of the law, to be disfranchised solely because the county clerk failed to transmit to the judges of election the application cards—an act in the discharge of which the electors had no voice and over which they could not exercise any control? To ask the question is to answer it.

In *State* v. *Fransham,* 19 Mont. 273, 48 Pac. 1, this court quoted approvingly from *People ex rel. Hirsh* v. *Wood,* 148 N. Y. 142, 42 N. E. 536, the following: ''We can conceive of no principle which permits the disfranchisement of innocent voters for the mistake or even willful misconduct of election officers in performing the duty cast upon them,'' and added: ''Or it might be put in this way: If no ante-election objection * * * is made, the provisions of the statute are to be treated as directory.''

In *Lane* v. *Bailey,* 29 Mont. 548, 75 Pac. 191, it appeared that ballots were cast by electors whose names had been entered on the registry lists but from whom the registry agent had not exacted the statutory affidavit, and for that reason the ballots were attacked as illegal. In holding that electors could not be thus disfranchised, this court said: ''That a registry agent neglects his duty should not deprive an elector of the right to exercise his franchise. If the elector may be deprived of his right to vote in this manner, an unprincipled registry agent may change the political status of a precinct at will, and

70 Mont.—16

by concerted action on the part of a number of such, the political complexion of a county may be easily changed, and the popular will effectually thwarted. If the elective franchise may be thus tampered with, incalculable abuses will creep into the state. The purpose of the statute is to prevent any but legal electors from voting. It demands good faith. It is not intended to prevent those who are qualified to vote from doing so. * * * Election statutes, being intended to promote purity in public elections, to the end that a full and fair expression of the public will may be had, are remedial and beneficial, and should be liberally construed.''

In *Carwile* v. *Jones,* 38 Mont. 590, 101 Pac. 153, it was made to appear that the judges of election had deposited in the ballot-box a ballot from which they failed to detach the stub, thus making it possible to identify the voter. In the contest which followed the trial court refused to count that ballot, and the ruling was held to be erroneous. This court said: ''It is a rule of well-nigh universal application 'that one entitled to vote shall not be deprived of his privilege by action of the authorities.' * * * In the absence of any showing of a corrupt or unlawful purpose, it will be presumed that this omission was the result of accident or inadvertence; but in any event, neither Jones nor the voter should be made to suffer for the misconduct or mistake of an election officer, where, as in this case, there is not any showing that either participated in, or was at all responsible for, the error.''

In *Harrington* v. *Crichton* above, it appeared that the judges of election in a given precinct, when stamping the ballots as they were delivered to the voters, in each instance placed the stamp so near the top of the ballot that when the stub was removed, the stamp was removed with it, leaving the ballot without the indorsement required by law. The statute then in force (now sec. 777, Rev. Codes) provided that any ballot not indorsed by the official stamp ''is void and must not be counted.'' Notwithstanding the language of that statute, this

court held that the ballots were properly counted, and this solely upon the theory than an elector may not be disfranchised by the careless or wrongful act of an election official over whose conduct he has no control.

Finally, in *Thompson* v. *Chapin* above, it was made to appear that certain electors had been permitted to vote without signing the precinct registry book, and the question presented was whether their ballots should be held to be illegal. Section 576, Revised Codes, provides, that before any elector is permitted to vote, the judges of election shall require him to sign his name in the precinct registry book provided for that purpose, and, if he fails or refuses to do so, being able to write, "he shall not be allowed to vote." This court held that the duty to see that the elector signs the registry book devolves primarily upon the election judges, and, if they fail in the performance of that duty and the electors are not at fault, their ballots cannot be excluded. It was said: "The general rule laid down by this court, which appears to be universally recognized, is that the right of our citizens to vote at an election cannot be defeated because of the failure of election officials to perform an administrative duty in the conduct of the election, specifically imposed upon such officials." It is no argument to say that the clerk may be punished for his dereliction of duty, for his punishment would not repair the wrong resulting from a disfranchisement of duly qualified electors.

Without further discussion we hold that where, as in this instance, the question of the right of the elector to vote under the circumstances here disclosed is not raised until after election, the provisions of section 727 above will be held to be directory, and that the failure of the county clerk to perform his duty will not operate to disfranchise the electors who were duly qualified and without fault.

Waiving aside the question whether, under proper circumstances, the defendants could bring before this court the testimony taken at the trial, without a bill of exceptions, it is

our opinion that there is not any excuse for presenting it in this instance, and the expense incident to the preparation and presentation of it is not recoverable.

The judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES COOPER, GALEN and STARK concur.