MADDOX ET AL., PLAINTIFFS, *v.* BOARD OF STATE CANVASSERS ET AL., DEFENDANTS.

(No. 8519.)

(Submitted April 26, 1944. Decided May 22, 1944.)

[149 Pac. (2d) 112.]

218

*Messrs. Wellington D. Rankin, Lester H. Loble, Arthur P. Acher, Howard Toole* and *Edmond G. Toomey,* for Plaintiffs, submitted an original and a reply brief; *Messrs. Rankin, Loble* and *Acher* argued the cause orally.

*Mr. R. V. Bottomly,* Attorney General, and *Fred Lay* and *P. J. Gilfeather,* Assistant Attorneys General, for Defendants, submitted a brief and argued the cause orally.

*Mr. George E. Hurd* and *Mr. Taylor B. Weir, amici curiae,* submitted briefs and argued the cause orally.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

This is a declaratory judgment action of which this court has accepted original jurisdiction. The action is brought with commendable unity by the chairmen of the state central committees of the two major parties, both personally and in their official capacity. Their purpose is to obtain a declaratory judgment determining the rights and duties of the citizens and public officers of Montana under Chapter 101, Laws of 1943, relating to voting by members of the military forces of the United States who are registered electors and are absent from the state.

This court has had the benefit of intensive oral and written

argument by able counsel for all the parties and also by other eminent members of the bar of Montana as *amici curiae.* All parties agree that not all of the Act is entirely workable or valid, and that certain of its provisions are in conflict with constitutional congressional enactments or with prior state legislative Acts which by section 21 of the Act the legislature has expressly stated its intention not to amend or repeal. As pointed out below, sections 21 and 22 indicate a like belief, or at least a misgiving, by the legislature. How much of the Chapter is valid and workable it is our task to determine, and we have approached the problem with full appreciation of our duty to give the statute a liberal construction in utmost conformity with the legislative intent, which was to give the fullest possible effect to its provisions without interfering with other laws relating to elections.

Sections 1 to 11, inclusive, 17, 18, and 20 to 24, inclusive, to which none of the parties takes exception, provide among other things a summary method for the delivery of ballots to qualified electors in the military and associated services, the voting of the same prior to the closing of the polls on election day, and the return thereof to the election officials of the several voting precincts of the state through the offices of the secretary of state and of the several county clerks if received by the secretary at least five days before the election.

The other sections, to which exception is taken by the plaintiffs and *amici curiae,* provide, with regard to ballots thereafter reaching the secretary of state's office, for their handling by the secretary of state and state treasurer, their canvassing by the state canvassing board at two separate canvasses to be held on the first and fourth Mondays in December, for the final determination of the election results only upon the last canvass, and for the final canvass by the county boards of canvassers "on the last day of December or as soon as the final returns shall have been received from the secretary of state, but not later than the Saturday preceding the first Monday in January following the general election." (Section 14.)

By sections 21 and 22 of the Chapter the legislature very

clearly expressed its misgivings as to the validity of parts of the Act, or at least as to their effect if allowed to amend the existing election laws. Those sections provide:

"Section 21. *Nothing in this Act shall be deemed to repeal or amend any of the provisions of law now existing relating to elections, but this Act shall be construed as supplementary to all such laws* and designed to carry into effect the purposes herein expressed, but in case of conflict or apparent conflict, the provisions of this *Act* shall, *within its scope and purpose, prevail.*"

"Section 22. If any section, subdivision, sentence or clause of this *Act* is held to be unconstitutional or inoperative by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this *Act.*"

Section 23, repealing "all *Acts* and parts of *Acts* in conflict herewith," must be construed in connection with section 21, and limited in effect by its terms.

The unusual provisions of section 21 suggest serious misgivings as to the result of the seven weeks delay after the statutory election day for the depositing of military ballots with election officials, upon the laws relating to elections, which include the casting and counting of ballots, the due qualification of elected officers, the bringing of contests under the Corrupt Practices Act, and other important phases of elections. It was apparently by reason of those doubts that the legislature provided that nothing in the Chapter "shall be deemed to repeal or amend any of the provisions of law now existing relating to elections," but that the Chapter shall be construed "as supplementary to all such laws and designed to carry into effect" the Chapter's purpose, and that in case of conflict with other laws the Chapter shall prevail only within that purpose. It seems apparent that the sole purpose of the Chapter was to insure the widest possible participation in elections by increasing to the utmost the opportunity for the state's electors in military service to cast their votes effectively, without changing

the election laws in other respects or endangering the effectiveness of the votes of all electors.

The chief objection made to the postponement of the final determination of election results to late in December is that under both the federal and state Acts (3 U. S. C. sec. 5; sec. 816, Rev. Codes) the presidential electors must meet on the first Monday after the second Wednesday in December following their election, and that the delay would deprive Montana of representation in the electoral college, which section 21 of Chapter 101 certainly negatives any intention of doing. Obviously the result would be to disfranchise, to that extent, all voters of the state, rather than to extend the opportunity of voting to our citizens who are absent from the state in military service. Such result was clearly not within the legislative intent.

But even if the expressed legislative intent had been to amend or repeal the state election laws to that extent, the legislature could not constitutionally have extended beyond the statutory election day the time for depositing ballots, so far as presidential electors are concerned. Section 1 of Article II of the Constitution of the United States provides in part: "The Congress may determine the time of choosing the electors, and the day on which they shall give their votes; which day shall be the same throughout the United States." Pursuant to that authority the Congress has provided: "The electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." (Sec. 1 of Title 3, U. S. C.)

Being within the powers expressly ceded to the limited federal sovereignty by the people of the United States, and having been exercised by the Congress, it is apparent that the states have no power to interfere. Thus the legislature may not constitutionally extend beyond "the Tuesday next after the first Monday in November" the time when the presidential electors shall be appointed or elected by the ballots of the voters.

The election statutes of Montana provide that the general

█ election shall be held on the first Tuesday after the first Monday of November in every even-numbered year (sec. 531, Rev. Codes); that the polls shall be open continuously from eight a. m. to 6 p. m., or until such prior time as all registered electors have voted (sec. 689); that voting may continue while the polls remain open (sec. 688); that the ballots shall be forthwith deposited in the ballot box (sec. 696) and publicly canvassed immediately after the polls close (secs. 774, 778); that "when the ballot has been placed in the box, one of the judges must write the word 'Voted' opposite the number of the person on the check-list for the precinct" (Section 703). In other words, voting is done not merely by marking the ballot but by having it delivered to the election officials and deposited in the ballot box before the closing of the polls on election day. (*Goodell* v. *Judith Basin County*, 70 Mont. 222, 224 Pac. 1110; 29 C. J. S. 293, sec. 207). The absent voters' law (secs. 715 to 735, Rev. Codes) makes no change in that respect; for the absent voters' ballots must be deposited in the ballot box between the opening and closing of the polls (sec. 727).

The federal and state laws must be read together; and since the state law provides for voting by ballots deposited with the election officials, that act must be completed on the day designated by state and federal laws. Nothing short of the delivery of the ballot to the election officials for deposit in the ballot box constitutes casting the ballot, which fact was unmistakable so long as the ballot continued to be, as originally, a ball or marble or other marker which was "cast" or deposited in an official receptacle or custody. The fact that the ballot has now become a sheet of paper upon which the voter's choices for the various offices are marked before it is deposited has not changed either the word used to characterize the act of casting the ballot, or the meaning of the word.

Thus Webster's New International Dictionary defines "cast" as "to deposit (a ballot) formally or officially." It is not the marking but the depositing of the ballot in the custody of the election officials which constitutes casting the ballot or vote.

Obviously, unless it reaches the officials it is never cast at all, whether or not it is marked for any candidate, or forwarded by mail or otherwise. The fact that the ballot has to be marked before its casting can indicate the voter's intent, should not obscure the fact that it is still of no effect until it is deposited with the election officials, by whom the will of the voters must be ascertained and made effective.

Therefore in so far as Chapter 101 purports to extend beyond the election day the time within which voters' ballots may be received by the election officials for the election of presidential electors, it is in conflict with the constitutional congressional Act which requires the electing to be done on election day. It is, accordingly, unconstitutional to that extent. A diligent search has disclosed no authorities nor precedents to the contrary.

There are also state election laws which the legislature expressly declared that it had no intention to amend or repeal and which make the delay inoperative as to other officers also. Thus section 432 provides that where notice is not given the officer of his election, he must take, subscribe and file his oath of office "before the expiration of fifteen days from the commencement of his term of office." Section 468 makes the mandatory provision (*State ex rel. Wallace* v. *Callow*, 78 Mont. 308, 254 Pac. 187), that unless otherwise expressly provided by statute every official bond must be filed within the time prescribed for filing the oath. While the provision of section 432 has been held directory and not mandatory it is expressive of the policy of the law, and section 511, by a provision which has been strictly applied (*State ex rel. Muzzy* v. *Uotila and Certain Intoxicating Liquors*, 71 Mont. 351, 229 Pac. 724; *State ex rel. Nagle* v. *Stafford*, 99 Mont. 88, 43 Pac. (2d) 636), provides that an office becomes vacant upon the officer's "refusal or neglect to file his official oath or bond within the time prescribed."

Section 10805 provides that election contests must be commenced within forty days after the return day of the election,

which means the day on which the county clerk delivers the returns to the county canvassing board. (*Wilkinson* v. *LaCombe,* 59 Mont. 518, 197 Pac. 836.) The returns must be delivered by the county clerk to the canvassing board when it meets to canvass the returns (sec. 788), which must be within ten days after the election (sec. 790). The 1944 election will be held on November 7th. The return day will therefore be no later than November 17th, and in that event election contests may be filed not later than December 27th. Under section 13 of Chapter 101, the state board of canvassers is to meet on the fourth Monday in December (December 25, 1944), and under section 14, the county canvassing board is to convene for its final canvass only upon the receipt of the final returns of the state board of canvassers, which may be as late as the last day of December, if not later than "the Saturday preceding the first Monday in January," which in 1944 will be December 30th. It is manifest, therefore, that the time for contest for many offices might expire in 1944 before the results of the election could, under those provisions, be officially determined.

Whatever the legislative intention, the question suggests itself ▇ whether it might not be a violation of the constitutional command that "all elections shall be free and open" (Art. III, sec. 5, Const. of Montana) to conduct the election in such a way as to defeat its purpose by ascertaining the results too late for presidential electors to perform their duty, and for other elected officials to qualify for office. Is the election free and open, when in effect there is no election at all, but only an ineffective act?

It may well be that in most respects the legislature has power to change the election laws so as to provide that the election may be conducted and the polls kept open for the receipt of ballots by the election officials until December 25, 1944, and the final result determined only on December 30th. Certainly such a course might result in very dangerous possibilities of fraud and uncertainty; but we should perhaps nevertheless be required to give effect to the change if clearly expressed by the legislature.

It is fortunate, therefore, that in section 21 the legislature negatived the intent ''to repeal or amend any of the provisions of law now existing relating to elections,'' but on the contrary expressed the intent that Chapter 101 should prevail and thus become operative only within its purpose, which is clearly to extend the voting privilege to electors in military service as fully as may be done without amending or repealing any election law.

It is well settled that where a statute is unconstitutional only in part the remainder, if complete in itself and capable of being executed in accordance with the apparent legislative intent, may be sustained. (*State ex rel. Evans* v. *Stewart*, 53 Mont. 18, 161 Pac. 309; *State ex rel. Esgar* v. *District Court*, 56 Mont. 464, 185 Pac. 157; *Mulholland* v. *Ayers*, 109 Mont. 558, 99 Pac. (2d) 234.) That is necessarily true, for it is only the court's sworn duty to uphold the Constitution which forbids it to uphold statutes conflicting therewith or enacted by the legislature in excess of the latter's constitutional authority; the courts can have, therefore, no power to interfere with the remaining constitutional provisions of the enactment, if separately operative. The severability provision (sec. 22) cannot limit or extend the courts' authority in that regard. It merely expresses, for the courts' guidance, a legislative intent to enact whatever of the Chapter is constitutional and operative and thus separately workable (*State ex rel. City of Missoula* v. *Holmes*, 100 Mont. 256, 47 Pac. (2d) 624, 100 A. L. R. 581), in spite of the inclusion also of unconstitutional or inoperative provisions.

It is our conclusion therefore, that sections 12, 13, 14, 15, 16 and 19 of Chapter 101, which provide for the receipt and holding of ballots by the secretary of state and the state treasurer, and their delivery after the closing of the polls to the state canvassing board, and their canvassing and inclusion in the election returns by the state and county canvassing boards, and their subsequent retention by the secretary of state, are unconstitutional and void as to presidential electors and

are not intended by the legislature to become effective as to other elected officers in the event it should be ascertained that the result would be not purely supplemental, but would be to amend or repeal election laws existing at the time of the Chapter's enactment.

It is further our conclusion that sections 1 to 11, inclusive, ▮ and sections 17, 18, 20, 21, 22, 23 and 24, providing for the automatic forwarding of ballots to all registered electors of the state of Montana known to be in the military service as defined in the Act, and for the marking by the voters and the delivery thereof to the proper election officials through the secretary of state, and constituting other essential portions of the Chapter, are valid and operative. We conclude also that under section 20 the secretary of state should cause to be printed and forwarded with the ballots only the sections of the Chapter herein found valid and operative. We conclude further that as to any ballot received by him after the time specified by section 11, namely after five days before the election date, it is the duty of the secretary of state to forward the same immediately to the county clerk of the proper county, either by registered mail or by such other more expeditious means as may be best fitted to deliver it safely and quickly, and that promptly upon his receipt thereof, it is the county clerk's duty to forward the same by the most expeditious and safe means to the election officials of the proper voting precinct, so as to carry out the legislative intent that every possible military voter's ballot may be received by the election officials before the closing of the polls on election day. It seems obvious that those officials would have no right to hold such ballots or to dispose of them otherwise than to further their fullest opportunity for effective use.

This interpretation gives the fullest possible effect to the beneficial legislative purpose, eliminating those parts which would be unconstitutional, or destructive or amendatory of existing laws relating to elections or of the rights of Montana's

citizens under those laws, and leaving a constructive Act of purely supplemental legislation, as intended by the legislature.

If prompt and diligent performance is had by the public officials of their duties under this and other statutes, by which the official ballots may be made available almost three months before the election, and if proper transportation means are furnished by the federal civil and military authorities, there seems no reason why all Montana electors within the purport of Chapter 101 may not have full opportunity to exercise their privilege and duty of voting, despite their absence in military service.

ASSOCIATE JUSTICES ANDERSON and ADAIR concur.

MR. JUSTICE MORRIS:

I concur in the result but not in the majority opinion as a whole. The relators sought clarification of Chapter 101 of the 1943 Session Laws and sought to have this court indicate the manner as to how it should be fitted into our election laws, and such purpose did not call for an extended and prolix discourse on elections generally.

I concur in holding sections 12, 13, 14, 15, 16 and 19 of Chapter 101 unconstitutional, and think section 23 should also be so held. But do not think section 1 is invalid. That section merely outlines the purpose of the Act and supplements the absent voters' law long in effect in this state, and I see no conflict between that section and any other provision of our laws. It comes close to falling within the constitutional prohibition against class legislation, but is not otherwise open to criticism.

I am emphatically opposed to any recognition of the right to cast a ballot on any other day than the one fixed by statute. The majority opinion by implication would approve a legislative Act authorizing the reception of and counting of ballots subsequent to the election day fixed by law. The majority do not state plainly whether they would approve such an Act for a certain class of voters or would include all voters, and I think

the opinion would have been much better if any discussion of that particular phase of election laws had not been dealt with at all.

One general election day has been the established rule in America since early Colonial days, and by tradition and practice it has become in every state of the Union as firmly established in the American mind as any provision of our Constitution, and to countenance any different practice now would, in my opinion, be a revolutionary act almost universally condemned. But if election day were fixed by law to begin on a certain date and to continue for several weeks thereafter, to receive ballots daily and count the same, in order to meet the convenience of a certain class of voters, such election day being continued until a fixed time, all voters would demand the same right as that extended to the particular class, and the demand under our theory of equal rights to all would have to be granted.

If the majority opinion were confined to the questions which were presented by the petition and the other speculative questions saved until they could be properly presented for an opinion by the Court, the opinion would carry much greater weight.

MR. JUSTICE ERICKSON, dissenting in part:

While I agree with the majority that the provision calling for the second canvass of votes which comes too late to allow Montana to effectively vote for president and vice-president of the United States is unconstitutional in that it deprives the voters of this state of that right and while I agree that by reason of the saving clause in the statute we may declare a part of the Act ineffective and still retain the balance, I cannot agree with the court's final conclusion that only the votes of soldiers which are actually deposited in the ballot boxes in the various precincts on election day, may be counted. The majority does not question the right of the legislature to make provision for the counting of ballots which are not received until after election day. There is no constitutional interdiction to prevent the legislature from making such a provision. The majority reaches this result

230

through its interpretation of section 21 of Chapter 101, providing, "Nothing in this *Act* shall be deemed to repeal or amend any of the provisions of law now existing relating to election, but this *Act* shall be construed as supplementary to all such laws and designed to carry into effect the purposes herein expressed."

In the first place it seems to me that the provision for the counting of ballots received after election day is merely supplementary to the general election law, but if it could be said that the effect of Chapter 101 was to amend the existing election laws, then the last three lines of the section 21 show a very clear intention on the part of the legislature that the specific provision in sections 12 and 13 of Chapter 101 shall control. Those sections provide for the canvass of votes received after the date of the election. The legislature had clearly in mind the vast distances the ballots must travel, the difficulties attendant on mail service and in the plainest possible English language said that so long as the soldier casts his ballot on or before election day and so long as the ballot was received within the limits fixed by the statutes it should be counted. It is the province of this court, so often repeated by it that no citation of authorities is necessary, solely to determine the legislative intention where there is no constitutional problem presented. Here the majority on the basis of that part of section 21 which it has chosen to emphasize and ignoring the balance of the section, has stricken all this provision of the law from the books. It has gone contrary to the express language of the Act, specifically setting up the provision allowing for the canvassing of votes received after election day and it has also ignored the saving clause in section 21 which makes abundantly clear the intention of the legislature that in the event there is a conflict between the general laws already in existence and this special law dealing only with the votes of our servicemen and women, then the general must give way to the special. The obvious purpose of section 21 was to leave the general election law in effect as to everyone else and as to matters not covered by

Chapter 101. That Chapter dealt with only the voting of Montanans in war service and section 21 was enacted to show that purpose.

The majority opinion is in effect an indictment of the wisdom of the legislature in passing such a soldiers' vote law as we have before us. I am in agreement that the present law is so hemmed around with restrictions and requires so many interchanges of correspondence between the state of Montana and our soldier citizens spread throughout the world that it will be difficult for our servicemen and women to effectively cast their ballots in our Montana election. That situation is not bettered by the interpretation placed upon the Act by the majority. In many cases, under the present interpretation of the statute, servicemen will have to cast their ballots many weeks in advance of the election day in order to comply with the law as it is now set up by the majority. The majority does not say how ballots received after the five-day period immediately preceding the election shall be disposed of. Under the law, as it was written by the legislature, ballots could only be forwarded to the local voting precincts that were received at least five days before the general election. May this court judicially declare that it is the duty of the secretary of state, in spite of the strict injunction of the legislature to the contrary, to forward to the various counties all ballots received during the five days preceding the election day? Under the interpretation of the majority that result would be desirable, but has this court the power to so decree?

The majority is very much concerned also with the possibility of fraud in the canvass of votes received after the date of election. That is a matter so exclusively within the province of the legislative wisdom that to me it seems incredible that this court can consider it here at all. If the method set up for canvassing and counting these ballots received after election day is unwise and defective the only cure for these provisions as well as.many others that appear cumbersome is by special legislative session. Such a session could establish a method for canvassing these

ballots received after election day in a manner so that there could be no possibility of the fraud the majority is concerned about. While of course there may be a possibility of fraud in the canvass of the votes, this court should not presuppose it any more than the legislature did and to me it seems more important that servicemen be given every opportunity to vote than to deny them that right because of the possibilities of fraud that may appear. The important thing however about the whole matter is that the legislature has spoken within its authority and whether wisely or unwisely is not our province here to determine. I therefore dissent from that part of the majority decision holding that ballots received too late to deposit in the ballot boxes at the various polling places on election day may not be counted.