(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WATSON, MISSISSIPPI SECRETARY OF STATE *v.* REPUBLICAN NATIONAL COMMITTEE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 24–1260. Argued March 23, 2026—Decided June 29, 2026

The federal election-day statutes set the day for the "election" of Representatives, Senators, and the President on a Tuesday in November. See 3 U. S. C. §1, 2 U. S. C. §§ 1, 7. Mississippi permits certain residents, such as college students away from home and senior citizens, to vote in federal elections by absentee ballot. Miss. Code Ann. §23–15–713. Mississippi is one of roughly 30 States that count at least some absentee ballots mailed by election day but received afterward. Absentee voters in Mississippi may dispatch their ballots by mail or common carrier, and all absentee ballots must be "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." §§23–15–637(1)(a), (3).

In 2024, the Republican National Committee, the Mississippi Republican Party, and various individuals sued the Mississippi secretary of state and several election officials, contending that federal law prevents Mississippi from counting absentee ballots received after election day. According to plaintiffs, the election-day statutes use the word "election" to refer to two acts—ballot casting and ballot receipt—so by setting the day for the "election," these statutes set the deadline for both. The Libertarian Party of Mississippi filed a similar suit, and the District Court consolidated the cases, and then granted summary judgment to Mississippi. The Fifth Circuit reversed, holding that Mississippi's statute is preempted because the federal election-day statutes require ballots to be received by election day.

*Held*: The federal election-day statutes do not prevent Mississippi from counting absentee ballots postmarked by election day but received up

to five days thereafter; nothing in the federal election-day statutes requires ballots to be received by election day.  Pp. 5–21.

(a) The question before the Court is narrow: whether counting ballots postmarked by election day, but received up to five days later, violates the federal election-day statutes.  Plaintiffs do not challenge the general practice of absentee voting, the use of the Postal Service or common carrier to transmit ballots, early voting, or the counting and certification of votes after election day.  The Court also does not consider the scope of Congress's authority to regulate federal elections.  P. 5.

(b) The federal election-day statutes do not preempt Mississippi's law because the defining element of an "election" has always been the electorate's choice of candidate.  And a related federal statute—the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)—confirms that while federal law dictates when ballots must be cast, state law governs when they must be received.  It is a "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute," *New Prime Inc.* v. *Oliveira*, 586 U. S. 105, 113 (internal quotation marks and ellipses omitted), and at all relevant points, the word "election" was understood to mean "[t]he act of choosing a person to fill an office," N. Webster, An American Dictionary of the English Language 433.  The Court has likewise defined "election" as the expression of the electorate's choice, explaining that "[f]rom time immemorial an election . . . has been . . . no more and no less than the expression by qualified electors of their choice of candidates." *United States* v. *Classic*, 313 U. S. 299, 318.

The electorate's choice is made when voting is complete, not when ballots are received.  The most recent amendment to the Presidential election-day statute bears this out.  While inserting the phrase "election day" into the statute and marking that date as a specific Tuesday, Congress also provided that when States "modif[y] the period of *voting*" in response to certain force majeure events, the term "election day" shall "include the modified period of *voting*."  3 U. S. C. §21(1) (emphasis added).  That Congress defined "election day" with reference to "voting" indicates that "voting" is the act governed by the statute.  UOCAVA—which requires States to permit absent military and overseas voters to cast absentee ballots in federal elections and, as a backup, establishes a federal absentee voting system, 52 U. S. C. §20302(a)(1)—reinforces the point.  In detailing this system, UOCAVA repeatedly presupposes ballot receipt is a matter of state law.  For example, to avoid any double counting, UOCAVA provides that federal absentee ballots "shall not be counted" if a State receives the voter's state absentee ballot by "the deadline for receipt of [that] ballot under

State law."  §20303(b)(3).  If the election-day statutes established a nationwide ballot-receipt deadline, UOCAVA's references to state ballot-receipt deadlines would make little sense.

Finally, this interpretation is consistent with the Constitution's requirements for the electoral college.  The Constitution requires the "Day on which [the electors] shall give their Votes" to be "the same throughout the United States," Art. II, §1, cl. 4, but says nothing about the day for receipt.  The Constitution thus envisions a system in which receipt of votes is necessarily divorced from voting.  And it sets the crucial, uniform day as the day of voting while leaving receipt to happen later.  The federal election-day statutes follow the same pattern.  Pp. 5–9.

(c) Plaintiffs' contrary view—that the election-day statutes require ballots to be received by election day—relies heavily on historical practice, precedent, and policy.  But the historical practice plaintiffs identify is not dispositive; plaintiffs overread the Court's precedent; and policy cannot override the words Congress chose.  Plaintiffs emphasize that in the mid-to-late 19th century, ballot receipt occurred on election day, and that in the Civil War-era, States that authorized absentee voting imposed strict election-day deadlines for ballot receipt.  But plaintiffs admit they cannot precisely tie this historical practice to the text of the election-day statutes.  State legislatures may have used an election-day deadline for any number of reasons unrelated to federal requirements.  For example, they may have shared plaintiffs' view that an election-day deadline avoids the appearance of fraud from late-arriving ballots.  At bottom, plaintiffs' theory is that because 19th-century election-day statutes govern here, so too do 19th-century voting practices.  But statutes do not "tra[p] in amber" every contemporary practice on the same subject matter.  *United States* v. *Rahimi*, 602 U. S. 680, 691.

Plaintiffs' interpretation of the election-day statutes is at odds with UOCAVA, which presupposes that States retain power to set ballot-receipt deadlines.  At oral argument, plaintiffs and their *amicus*, the United States, offered ways to "reconcile" their interpretation of the election-day statutes with UOCAVA, Tr. of Oral Arg. 79–80, but their theories are unpersuasive.

Plaintiffs argue that *Foster* v. *Love*'s definition of "election" as the "combined actions of voters and officials meant to make a final selection of an officeholder," must mean the "combined actions" of ballot casting and receipt.  522 U. S. 67, 71.  But *Foster* is not about ballot receipt and nowhere mentions it; *Foster* decides only that an election "may not be *consummated* prior to federal election day," *id.*, at 72, n. 4 (emphasis added), and specifically refuses to "isolat[e] precisely what acts a State must cause to be done" on election day, *id.*,

Syllabus

at 72.

   Finally, plaintiffs' policy arguments about election integrity and voter confidence are properly directed to legislatures, not courts, see, *e.g.*, *SAS Institute Inc.* v. *Iancu*, 584 U. S. 357, 368, and regardless, plaintiffs' definition of "election" would do little to address the concerns they identify.  Pp. 9–21.

   (d) Plaintiffs argue that Mississippi's election system violates the election-day statutes because the Postal Service and common carriers allow mail to be recalled before it is delivered to election officials, meaning that the electorate's choice is not actually made as of election day.  Even if plaintiffs are right about Mississippi law, they would still lose the challenge they have pressed in this litigation: that post-election-day ballot receipt is itself unlawful.  Post-election-day receipt, considered on its own, does not conflict with the election-day statutes, and state law is preempted only "'so far as the conflict extends,'" *Foster*, 522 U. S., at 69.  Pp. 21–22.

120 F. 4th 200, reversed and remanded.

   BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, and JACKSON, JJ., joined.  ALITO, J., filed a dissenting opinion, in which THOMAS and GORSUCH, JJ., joined, and in which KAVANAUGH, J., joined as to all but Parts II–C–2 and III.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 24–1260

———

## MICHAEL WATSON, MISSISSIPPI SECRETARY OF STATE, PETITIONER *v.* REPUBLICAN NATIONAL COMMITTEE, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 29, 2026]

JUSTICE BARRETT delivered the opinion of the Court.

Three federal statutes set the day for the election of Representatives, Senators, and the President. A Mississippi law permits the counting of absentee ballots postmarked by election day but received up to five days later. We must decide whether the federal election-day statutes preempt Mississippi's law. They do not.

I

A

The Constitution's Elections Clause empowers state legislatures to "prescrib[e]" the "Times, Places and Manner of holding" congressional elections. Art. I, §4, cl. 1. Congress may "'override'" most of these choices. *Foster* v. *Love*, 522 U. S. 67, 69 (1997) (quoting *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779, 833 (1995)). By "default," however, "responsibility for the mechanics of congressional elections" belongs to States. *Foster*, 522 U. S., at 69. As Alexander Hamilton put it, the Constitution lodges power over congressional elections in state legislatures "primarily" and

in Congress "ultimately." The Federalist No. 59, p. 362 (C. Rossiter ed. 1961).

The Constitution's system for Presidential elections is similar. State legislatures may "direct" the "Manner" of appointing "Electors" to vote for President and Vice President. Art. II, §1, cl. 2. But "Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes." Art. II, §1, cl. 4.

Initially, Congress allowed States significant leeway with respect to the timing of elections. States had a 34-day window to appoint Presidential electors and exercised total control over the timing of other federal elections. See Act of Mar. 1, 1792, ch. 8, §1, 1 Stat. 239; J. Stonecash, J. Boscarino, & R. Kersh, Congressional Intrusion To Specify State Voting Dates for National Offices, 38 Publius: J. Federalism 137, 141–142 (2008). As soon became clear, this scheme was not the founding generation's finest. Fraud, or at least allegations of it, ran rampant—because States could hold elections on different days, voters could travel across the country, casting ballots in multiple States. See Cong. Globe, 28th Cong., 1st Sess., 679 (1844); J. Silbey, The American Political Nation, 1838–1893, pp. 147–148 (1991) (Silbey). So in 1845, Congress enacted the first election-day statute, setting Presidential elections for the Tuesday after the first Monday in November. Act of Jan. 23, 1845, ch. 1, 5 Stat. 721.

Allegations of fraud continued to plague the election of Representatives, which still took place on different days in different States. See Cong. Globe, 42d Cong., 2d Sess., 618 (1872); H. R. Rep. No. 31, 40th Cong., 3d Sess., pt. 2, pp. 77–78 (1869). Having one election day for the President and another for Representatives was also burdensome, because citizens were "forced to turn out" to the polls on "two different election days." *Foster*, 522 U. S., at 73–74. Plus, the results in States with early elections could influence voting in States that lagged behind. *Ibid.* So in 1872, Congress

intervened again, mandating that the election of Representatives also take place on a single day—the same Tuesday specified in the Presidential election-day statute. Act of Feb. 2, 1872, ch. 11, §3, 17 Stat. 28. After the ratification of the Seventeenth Amendment, Congress required Senators to be elected on the same day as Representatives. Act of June 4, 1914, ch. 103, §1, 38 Stat. 384. Today, each of the three election-day statutes sets the day for the "election" on a Tuesday in November.

### B

In our Nation's early years, voters had to cast their ballots in person in the district where they lived. See, *e.g.*, J. Benton, Voting in the Field: A Forgotten Chapter of the Civil War 4–5 (1915) (Benton). Elections were "lively public events," marked not only by "'continuous electioneering and political arguments'" but also by "'picnics, drinking, and boisterous celebration.'" T. El-Haj, Changing the People: Legal Regulation and American Democracy, 86 N. Y. U. L. Rev. 1, 14 (2011) (quoting Silbey 143). Public assembly was not just a matter of merriment—it also helped ensure that only those qualified to vote did so. See, *e.g.*, E. Evans, A History of the Australian Ballot System in the United States 48 (1917). Ballots were cast "in the company of neighbors and under the watchful eyes of community leaders." D. Collins, Absentee Soldier Voting in Civil War Law and Politics 1–13 (2014) (Ph.D. Dissertation, Wayne State University) (Collins). For instance, under the Pennsylvania constitution, a voter had to vote in "an appropriate election district, in order that his neighbours might be at hand to establish his right to vote if it were challenged, or to challenge if it were doubtful." *Chase* v. *Miller*, 41 Pa. 403, 419 (1862).

Things started to change during the Civil War, when some States allowed soldiers to vote from afar by absentee ballot. See Benton 4–14. Access to absentee voting

expanded throughout the 20th century, and today, every State lets at least some residents vote absentee. In fact, federal law requires States to permit absentee voting in certain circumstances. See 52 U. S. C. §10502(d).

Due dates for absentee ballots have shifted over time. During the Civil War, States that allowed absentee voting imposed an election-day deadline for ballot receipt. See *infra*, at 11–12. But during World War I, States began counting absentee ballots received after election day. See 1918 Md. Laws p. 130; 1919 Kan. Sess. Laws pp. 252–253; see also Cal. Political Code ch. 14, §§1359(b)–(c), 1360, pp. 363–364 (1923). Today, roughly 30 States count at least some absentee ballots mailed by election day but received afterward. See National Conference of State Legislatures, Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots (May 18, 2026), https://www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots.

Mississippi is among them. In Mississippi, certain residents, like college students away from home and senior citizens, may vote in federal elections by absentee ballot. Miss. Code Ann. §23–15–713 (Cum. Supp. 2025). These voters may dispatch their ballots by mail or common carrier. See §§23–15–637(1)(a), (3). All absentee ballots must be "postmarked on or before the date of the election and received by the registrar no more than five (5) business days after the election." *Ibid.*

In 2024, the Republican National Committee, the Mississippi Republican Party, and various individuals sued the Mississippi secretary of state and several election officials, contending that federal law prevents Mississippi from counting absentee ballots received after election day. According to plaintiffs, the election-day statutes use the word "election" to refer to two acts: ballot casting and ballot receipt. So by setting the day for the "election," plaintiffs argue, these statutes set the deadline for both. The

Libertarian Party of Mississippi filed a similar suit. The District Court consolidated the cases, then granted summary judgment to Mississippi. *Republican National Committee* v. *Wetzel*, 742 F. Supp. 3d 587, 601–602 (SD Miss. 2024).

The Fifth Circuit reversed, holding that Mississippi's statute is preempted because the federal election-day statutes require ballots to be received by election day. *Republican National Committee* v. *Wetzel*, 120 F. 4th 200, 215 (2024). It denied rehearing and rehearing en banc. *Republican National Committee* v. *Wetzel*, 132 F. 4th 775, 777 (2025). We granted certiorari. 607 U. S. 1020 (2025).

## II

### A

The question before us is a narrow one about timing. Plaintiffs do not challenge the manner in which Mississippi carries out federal elections. They do not, for example, challenge the general practice of absentee voting. Nor do they challenge the use of the Postal Service or a common carrier to transmit ballots.

Although the election-day statutes refer to a particular "day" for the election, plaintiffs do not contend that everything must occur on that day. For instance, they do not object to early voting or dispute that officials may count votes and certify a winner after election day.

Finally, this is not a case about the Constitution. We do not consider the scope of Congress's authority to regulate federal elections. The sole question before us is whether counting ballots postmarked by election day, but received up to five days later, violates the federal election-day statutes.

### B

The federal election-day statutes do not preempt Mississippi's law. The defining element of an "election"—the term

used in all three federal statutes—has always been the electorate's choice of candidate.  And a related federal statute, the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), confirms that while federal law dictates when ballots must be cast, state law dictates when they must be received.

As we have said before, the federal election-day statutes "simply regulate the time of the election." *Foster*, 522 U. S., at 71–72.  The statute governing Presidential elections provides that Presidential electors "shall be appointed, in each State, on election day, in accordance with the laws of the State enacted prior to election day."  3 U. S. C. §1.  "'[E]lection day'" is defined as the "Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President held in each State."  §21(1).  The statute governing House elections "establishe[s]" "the day for the election" of Representatives as the same Tuesday in November in every even-numbered year.  2 U. S. C. §7.  The calendar for Senate elections follows suit: Senators are "elected" at the "regular election . . . at which election a Representative to Congress is regularly by law to be chosen."  §1.

By setting the day for the "election," these statutes set the day when the electorate must make its choice.  It is a "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute." *New Prime Inc.* v. *Oliveira*, 586 U. S. 105, 113 (2019) (internal quotation marks and ellipses omitted).  The election-day statutes were enacted and amended across almost two centuries.  At all relevant times, the word "election" was understood to mean "[t]he act of choosing a person to fill an office."  N. Webster, An American Dictionary of the English Language 433 (C. Goodrich & N. Porter eds. 1869) (Webster 1869); see, *e.g.*, N. Webster, An American Dictionary of the English Language 288 (rev. ed. 1844) ("[t]he act of choosing

a person to fill an office"); Webster's New International Dictionary 706 (1914) ("[a]ct of choosing by vote a person to fill an office"); Webster's Third New International Dictionary 731 (2002) ("the act or process of choosing a person for office").

We have likewise defined "election" as the expression of the electorate's choice. "From time immemorial," we have observed, "an election to public office has been in point of substance no more and no less than the expression by qualified electors of their choice of candidates." *United States* v. *Classic*, 313 U. S. 299, 318 (1941); see *Republican National Committee* v. *Democratic National Committee*, 589 U. S. 423, 424 (2020) (*per curiam*) (explaining that a "fundamenta[l]" aspect of an election is ballot "cast[ing]," as distinguished from ballot "recei[pt]"). And when we interpreted the election-day statutes for the first (and until now, the only) time, we again emphasized the voters' choice. In *Foster*, we explained that "[w]hen the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final *selection* of an officeholder." 522 U. S., at 71 (citing Webster 1869, p. 433 (defining "election" as "[t]he act of choosing a person to fill an office"); emphasis added).

The electorate's choice is made when voting is complete, not when ballots are received. The most recent amendment to the Presidential election-day statute bears this out. In 2022, Congress inserted the phrase "election day" into that statute and marked that day as a specific Tuesday. 3 U. S. C. §21(1). It then created an exception: When States "modif[y] the period of *voting*" in response to certain force majeure events, the term "election day" shall "include the modified period of *voting*." *Ibid.* (emphasis added). That Congress defined "election day" with reference to "voting" indicates that "voting" is the act governed by the statute.

A related statute, UOCAVA, reinforces the point. 100 Stat. 924. It is the "most rudimentary rule" of statutory

interpretation "that courts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes." *Branch* v. *Smith*, 538 U. S. 254, 281 (2003) (plurality opinion). And UOCAVA confirms that while Congress has set the date by which absentee ballots must be cast, States have the power to set the date by which they must be received.

UOCAVA requires States to permit absent military and overseas voters to cast absentee ballots in federal elections. 52 U. S. C. §20302(a)(1). As a backup, it establishes a federal absentee voting system. In detailing this system, UOCAVA repeatedly presupposes that ballot receipt is a matter of state law. For example, it specifies that a federal absentee ballot shall not be valid if the State provides an absentee ballot "at least 60 days before the deadline for receipt of the State ballot under State law." §20303(e)(2). It also mandates that the ballots of overseas military voters be delivered "to the appropriate election officials" "not later than the date by which an absentee ballot must be received in order to be counted in the election." §20304(b)(1). Finally, to avoid any double counting, UOCAVA provides that federal absentee ballots "shall not be counted" if a State receives the voter's state absentee ballot by "the deadline for receipt of [that] ballot under State law." §20303(b)(3). If the election-day statutes established a nationwide ballot-receipt deadline, these references to state ballot-receipt deadlines would make little sense.

Finally, this interpretation of the election-day statutes is consistent with the way the Constitution treats elections. Although most voting in our country's early days occurred in person—making casting and receipt simultaneous—that was not true of the electoral college. For that, the Constitution establishes a system somewhat analogous to absentee voting: Presidential electors "shall meet in their respective States, and vote by Ballot," and then "transmit" their votes to the "Seat of the Government of the United States,

directed to the President of the Senate" for "count[ing]."
Art. II, §1, cl. 3. The Constitution requires the "Day on
which [the electors] shall give their Votes" to be "the same
throughout the United States." Art. II, §1, cl. 4. But it says
nothing about the day for receipt, and, of course, 18th-cen-
tury modes of transmission did not offer same-day delivery.
The Constitution therefore envisions a system in which re-
ceipt is necessarily divorced from voting, and it sets the cru-
cial, uniform day as the day of voting, leaving receipt to
happen down the line. The federal election-day statutes fol-
low the same pattern: They set when the people "shall give
their Votes," *ibid.*, but leave open when those votes must be
received.[1]

In sum, the election-day statutes require the electorate's
choice to be made on election day. That occurs so long as
election day is the deadline for individuals to vote—as it is
in Mississippi. But the election-day statutes do not set a
deadline for ballot receipt, so they do not prevent Missis-
sippi from counting ballots postmarked before election day
yet received afterward.

### III

Plaintiffs, echoed by the dissent, accept that the ordinary
meaning of "election" is "choice." See Brief for Respondent
Libertarian Party of Mississippi 21; Brief for Republican
Respondents 17–18; *post*, at 1–4 (opinion of ALITO, J.).
Nonetheless, they argue that statutes speaking only of
"choice" set a deadline for "receipt." Short on textual sup-
port for that proposition, they appeal to historical practice,
precedent, and policy. But the historical practice they

_____

[1] Indeed, a resolution of the Constitutional Convention equated the
"Day fixed for the Election of the President" with the day when the elec-
tors "should assemble to vote" and "transmit their votes." 2 Records of
the Federal Convention 665–666 (M. Farrand ed. 1911). Only later
would the new Congress and President of the Senate convene for "receiv-
ing, opening and counting the Votes for President." *Id.*, at 666.

identify is not dispositive; they overread our precedent; and policy cannot override the words Congress chose.

When it comes to the ordinary usage of the word "election," there is no dispute. An "election" is "[t]he act of choosing a person to fill an office." Brief for Respondent Libertarian Party of Mississippi 21 (internal quotation marks omitted); accord, *post*, at 3 ("agree[ing]" that an election is "the expression of the electorate's choice" (internal quotation marks omitted)); Brief for Republican Respondents 17–18 (similar).[2] Still, both the dissent and plaintiffs argue that choice requires more than ballot casting. According to the dissent, ballot receipt is necessary because it renders the electorate's choice "authoritative." *Post*, at 1–2, 4. But the dissent never says what "authoritative" means, much less why ballot receipt carries this transformative power. Plaintiffs, for their part, suggest that ballot receipt is significant because it marks the point at which we can say "who won." Tr. of Oral Arg. 72. But plaintiffs fail to explain why the electorate's choice is not made until we "know" "who won." *Ibid.* And in any event, we do not know who won when all ballots are received. Many other acts must occur first: Voter qualifications must be adjudicated, ballots authenticated, and votes counted. See Brief for Local Election Officials et al. as *Amici Curiae* 5–12. Plaintiffs have no statutory basis for making ballot receipt the magic moment.

Lacking a statutory foothold, plaintiffs (tracked closely by the dissent) pivot quickly to their primary argument:

–––––––––––––

[2] Although the dissent agrees that the word "election" means "choice," it also selectively quotes from two legal dictionaries to suggest that "election" was understood to encompass ballot receipt. See *post*, at 5. But those dictionaries define "election" the same way we do—as "[c]hoice," 1 J. Bouvier, Law Dictionary and Concise Encyclopedia 979 (8th ed. 1914) (Bouvier), or "[a] choosing," W. Anderson, Dictionary of Law 394 (1889) (Anderson). The separate language quoted by the dissent—"receiving the ballots," Bouvier 979, and "taking the votes," Anderson 394—describes the election practices of particular States.

historical practice. See, *e.g.*, Brief for Respondent Libertarian Party of Mississippi 14–28; *post*, at 6–12. They emphasize that in the mid-to-late 19th century—around the enactment of the first and second election-day statutes—ballot receipt occurred on election day. See Brief for Respondent Libertarian Party of Mississippi 18–19. And while one might dismiss this timing as a byproduct of in-person voting, plaintiffs insist that the advent of absentee voting proves otherwise. When some States authorized soldiers to vote by mail during the Civil War, ballot casting and ballot receipt were no longer simultaneous—so these States *could* have allowed a grace period for receipt.[3] But none did.[4] See *id.*, at 25; Brief for Republican Respondents 27. Instead, plaintiffs contend, ballots traveling through the war-torn country were not counted unless they

_____

[3] Most States that authorized absentee voting during the Civil War did not permit mail-in voting. See Collins 27. Instead, they erected polling places in the field, with military officers deputized to serve as election officials. See *ibid.* Under this system, called field voting, soldiers voted in person (though outside their home precincts), and ballot casting and ballot receipt remained simultaneous. So while the dissent lumps all soldier voting together, see *post*, at 6–7, the practice in most States does not shed light on whether States thought that mail-in ballots had to be received, rather than merely cast, by election day.

[4] While we accept it for the sake of argument, plaintiffs' account of this history is debatable. Two States tasked military officers, who were *not* deputized as election officials, with collecting soldiers' ballots on election day and then sending the ballots to state election officials for counting—which meant that ballots were not received into official custody until after election day. 1866 Nev. Stats. p. 215; 1864 R. I. Acts & Resolves p. 4. Plaintiffs insist that these ballots were still "effectively received into official custody on Election Day" because military officers were tasked with "certify[ing] the legitimacy of the votes" before sending them. Brief for Respondent Libertarian Party of Mississippi 32. But it is not clear why collection and certification by military officers should be treated as "effectiv[e] recei[pt]" by the State. *Ibid.* And if "effectiv[e] recei[pt]" rather than actual receipt is the standard, then why doesn't Mississippi's law—which requires all ballots to be received by the Postal Service or common carrier by election day—pass muster?

were received by election day.  See Brief for Respondent Libertarian Party of Mississippi 25.  Why would any State be so exacting, plaintiffs ask, if federal law did not demand it?

Notably, plaintiffs admit that they cannot "precisely" tie this historical practice to the text of the election-day statutes.  Tr. of Oral Arg. 119–120.  That is a delicately put understatement.  Plaintiffs' theory is that if the relevant States could have changed the rules, they would have changed the rules.  Yet despite a deep dive into the historical record, plaintiffs have found no evidence that any of these States wanted to extend ballot-receipt deadlines, much less that they thought federal law prevented them from doing so.[5]

Plaintiffs treat this "federal law made me do it" theory as obvious, but state legislatures may have used an election-day deadline for any number of reasons.  For instance, they might have shared plaintiffs' view that an election-day deadline avoids the appearance of fraud from late-arriving ballots.  See D. Inbody, The Soldier Vote 41 (2016) ("Concern for voter fraud was always at the forefront of legislative action in connection with the soldier vote").  They might have believed it essential to election integrity to open soldier ballots in the public's presence, which was possible only if ballots arrived by the day the community gathered

—————

[5] The dissent, which treats the inference from history as dispositive, uncritically accepts plaintiffs' version of events.  It asserts—without citation—that States during the Civil War "wanted to ensure that soldiers had a voice in selecting the officials who would direct the deadly conflict in which they were engaged." *Post*, at 10.  Abraham Lincoln had a less rosy view: In his annual message to Congress, President Lincoln estimated that at least 90,000 soldiers were unable to vote in the 1864 Presidential elections because "the laws of [their] States" did not permit them to "vote away from their homes."  Cong. Globe, 38th Cong., 2d Sess., App. 3 (1864).  That several States did not allow soldiers to vote absentee at all belies the dissent's narrative that States did everything in their power to enable the soldier vote.

for in-person voting. See 1864 N. Y. Laws p. 551 (requiring soldier ballots to be "publicly opened"); 1865 Ill. Laws p. 61 (same); see also 1864 Pa. Laws No. 871, §§6, 35, pp. 991, 998 (providing that soldiers' qualifications to vote "may be challenged" by any other voter as if "he were personally present"). They might have thought it efficient for election officials to accept absentee ballots when the officials were already assembled for in-person voting. See *id.*, §34, pp. 997–998 (soldier ballots to be opened "in the presence of the election board"). Frankly, in this first experiment with absentee voting, extending the deadline might not have even occurred to them. Habit has force, even in wartime. Plaintiffs assume that state legislatures had a single goal—enabling the soldier vote—and went as far as they could to achieve it.[6] But as we have frequently observed, "[n]o statute pursues a single policy at all costs." *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 81 (2023). That principle applies to wartime statutes too.

At bottom, plaintiffs' theory is that because we are governed by 19th-century election-day laws, we are also governed by 19th-century voting practices. Carried to its logical conclusion, this theory would call into question the way modern elections work. As plaintiffs acknowledge, States might need to adjudicate voter qualifications by election day, as was done in the 19th century. See Tr. of Oral Arg. 89–91. Election officials suggest that doing so would be difficult, if not impossible. See Brief for Local Election Officials et al. as *Amici Curiae* 5–12. After all, America's population has grown since then, as has the portion of its population eligible to vote and the practice of absentee voting. The neighborhood-watch approach to election security no longer suffices; States have developed more

––––––––––

[6] The dissent dismisses the possibility that States might have had policy reasons for using an election-day receipt deadline, *post*, at 9–11—then spends approximately six pages extolling the policy reasons for using an election-day receipt deadline, *post*, at 16–22.

sophisticated methods of adjudicating voter qualifications. See *ibid.* Early voting would also be at risk, because in the 19th century, the polls were open only on election day itself. See, *e.g.*, Ill. Rev. Stat., ch. 37, §14 (1845); 1852 Ind. Acts p. 262; see also R. Bensel, The American Ballot Box in the Mid-Nineteenth Century 35–37 (2004). If these results were dictated by ordinary meaning, we would of course be bound to see them through. But historical practice, detached from statutory text, is not controlling. Statutes do not "tra[p] in amber" every contemporary practice on the same subject matter. *United States* v. *Rahimi,* 602 U. S. 680, 691 (2024).

Moreover, even accepting plaintiffs' interpretive approach, it is not clear why 19th-century election practices are dispositive. Plaintiffs focus on them because the first two election-day statutes were enacted in that period. But shortly after the third statute was enacted in 1914, absentee voting became popular again as a result of World War I—and this time, some States began counting absentee ballots received after election day.[7] See 1918 Md. Laws, at 130; 1919 Kan. Sess. Laws, at 252–253; see also Cal. Political Code ch. 14, §§1359(b)–(c), 1360, at 363–364. If we interpret the election-day statutes by drawing inferences from state behavior, it is unclear why we cannot account for the time of the third statute too. And once we move beyond the 19th century, historical practice undercuts plaintiffs' position.

In any event, plaintiffs have another problem: Their interpretation of the election-day statutes is at odds with UOCAVA, which (as discussed) presupposes that States

---

[7] The dissent brushes off these World War I statutes as "short-lived outlier[s]," *post*, at 8, but relies heavily on Civil War mail-in voting statutes that were themselves "short-lived outlier[s]," see *supra*, at 10–12, and n. 3; Benton 314–315; see also *post*, at 12–13 (relying on a lone Montana state-court decision).

retain the power to set ballot-receipt deadlines.[8]　Plaintiffs and their *amicus*, the United States, offer various ways to "reconcile" their interpretation of the election-day statutes with UOCAVA.　Tr. of Oral Arg. 79–80.　Their theories are unpersuasive.

Plaintiffs and the United States cannot even agree among themselves on how this reconciliation should work.　The United States argues that UOCAVA creates an exception to the ballot-receipt deadline set by the election-day statutes. In its view, States may count the absentee ballots of military and overseas voters even if they arrive after election day.　Brief for United States as *Amicus Curiae* 24.　Plaintiffs cannot quite stomach that interpretation, see Tr. of Oral Arg. 79–80, 85; accord, *post*, at 15–16, and for good reason: UOCAVA is not worded like an exception.　It does not authorize States to create ballot-receipt deadlines; rather, it presumes that States have that authority already. See, *e.g.*, 52 U. S. C. §20303(b)(3) (federal absentee ballots "shall not be counted" if a State receives the voter's state

_____

[8]To escape the force of the related-statute canon—which all agree is the canon relevant here—the dissent mischaracterizes it.　See *post*, at 14–16.　The dissent selectively quotes from *West Virginia Univ. Hospitals, Inc.* v. *Casey*, 499 U. S. 83, 100–101 (1991), to suggest that a later-enacted statute can inform the meaning of a related, earlier one only in extreme circumstances.　*Post*, at 15–16.　But a later enactment will "often change the meaning that would otherwise be given to an earlier provision that is ambiguous."　See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 330 (2012).　When faced with such ambiguity, we interpret the earlier provision "to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law."　*West Virginia Univ. Hospitals*, 499 U. S., at 100.　If the dissent thought that the term "election" unambiguously encompassed ballot receipt, it would not need to rely so heavily on historical practice.　Thus, the dissent must ask what "permissible meaning" "most logically and comfortably" fits with UOCAVA.　*Ibid.*　The dissent resorts to misstating the related-statute canon only because the answer to that question is so obvious.

absentee ballot by "the deadline for receipt of [that] ballot under State law").

Plaintiffs' efforts to explain UOCAVA fare no better. Plaintiffs initially argued that UOCAVA recognizes States' authority to set ballot-receipt deadlines *before* but not *after* election day. See Brief for Respondent Libertarian Party of Mississippi 42 (arguing that Congress tied the ballot-receipt deadline to state law "because at least one state at the time required absentee ballots to be received *before* Election Day"); Brief for Republican Respondents 43–44 (similar). But UOCAVA's text draws no such distinction, and by the time oral argument rolled around, plaintiffs had seemingly abandoned the point. Instead, they stressed that UOCAVA also applies to other elections, like primaries, that the election-day statutes do not govern. See Tr. of Oral Arg. 79–87.[9] And that, the argument goes, is the reason why UOCAVA incorporates state ballot-receipt deadlines.

But this interpretation of the statute does not work either. UOCAVA presupposes that the deadline for ballot receipt is uniformly a matter of state law; it does not distinguish between general and other elections. See, *e.g.*, 52 U. S. C. §20303(e). And the provision directing the President's designee to ensure that ballots of overseas military voters are received by state officials "not later than the date by which an absentee ballot must be received in order to be counted" applies only to "regularly scheduled general elections," §20304(b)(1)—exactly the elections for which plaintiffs claim the election-day statutes already set a uniform

---

[9] The dissent likewise maintains that military and overseas voters get no grace period in a general election. See *post*, at 15–16. It does not decide, though, which of plaintiffs' two proposals is correct. Compare *ibid.* (suggesting that UOCAVA references state receipt deadlines because the election-day statutes do not govern primaries), with *post*, at 15, n. 8 (suggesting that UOCAVA references state receipt deadlines because "States can set earlier deadlines" for general elections).

ballot-receipt deadline.[10]  Given the difficulties of plaintiffs' interpretation, it is little wonder that roughly 30 States count military and overseas voters' absentee ballots that arrive after election day.

Next, plaintiffs turn to precedent.  See, *e.g.*, Brief for Respondent Libertarian Party of Mississippi 28–29; accord, *post*, at 12–14.  They argue that when *Foster* defines "election" as the "combined actions of voters and officials meant to make a final selection of an officeholder," it must mean the "combined actions" of ballot casting and receipt.  522 U. S., at 71.  *Foster*, however, does not support that conclusion.

In *Foster*, we considered whether Louisiana's system for open primary elections was consistent with the federal election-day statutes.  See *id.*, at 70.  Unlike a conventional, party-run primary, Louisiana's primary was run by the State.  And if a candidate got a majority of votes in the primary, that was it: The candidate was "elected, and no further act [was] done on federal election day to fill the office in question."  *Ibid.* (internal quotation marks and citation omitted).  While this system was in place, "over 80% of the contested congressional elections in Louisiana . . . ended as a matter of law with the open primary."  *Ibid.*  We held that this system violated the federal election-day statutes because the "contested selection of candidates" could be

——————

[10] The dissent objects that this provision "does not cross-reference state-law deadlines."  *Post*, at 16, n. 9.  But if the election-day statutes already established the "election" as the deadline for ballot receipt, Congress could have simply directed the designee to ensure all ballots are received by the "election."  Indeed, UOCAVA elsewhere ties the timeframe for certain actions to the "election."  See 52 U. S. C. §20302(a)(8)(A) (requiring States to transmit absentee ballots "not later than 45 days before the *election*" (emphasis added)).  That Congress did not do so here suggests that the "election" is not synonymous with the "date by which an absentee ballot must be received in order to be counted in the election."  §20304(b)(1).

"concluded as a matter of law before the federal election day." *Id.*, at 72.

*Foster* is not about ballot receipt and nowhere mentions it. In fact, *Foster* does not address absentee voting at all. It decides a narrow issue narrowly, "hold[ing]" only that an election "may not be *consummated* prior to federal election day." *Id.*, at 72, n. 4 (emphasis added). True, *Foster* defines "election" to involve the "combined actions" of "voters and officials." *Id.*, at 71. But there is no reason to think that *Foster* is referring to the backend act of ballot receipt rather than the frontend acts necessary for the electorate to make its choice—like establishing the rules for the election, setting up polling sites, or providing ballots. *Foster* specifically refuses to "isolat[e] precisely what acts a State must cause to be done" on election day. *Id.*, at 72. Thus, plaintiffs overread *Foster* to do exactly what it disavows. See also *post*, at 13–14.

Plaintiffs, joined by the dissent, also place significant weight on a decision from the Montana Supreme Court, *Maddox* v. *Board of State Canvassers*, 116 Mont. 217, 149 P. 2d 112 (1944). See, *e.g.*, Brief for Republican Respondents 39–40; accord, *post*, at 12–13. *Maddox* held unlawful a new Montana statute that allowed soldier ballots to be received after election day. But *Maddox* turned on existing state law, which the new law did "not . . . amend or repeal." 116 Mont., at 220, 149 P. 2d, at 113; see *id.*, at 220–222, 149 P. 2d, at 114. An existing statute required all ballots to be "delivered to the election officials and deposited in the ballot box before the closing of the polls on election day." *Id.*, at 223, 149 P. 2d, at 115. "[S]ince the state law provide[d] for voting by ballots deposited with the election officials," *Maddox* reasoned, "that act must be completed on the day designated by state and federal laws." *Ibid. Maddox* thus viewed receipt as governed by state, not federal, law. Indeed, both the concurring and dissenting opinions stressed that the majority's opinion left the Montana legislature free

to "authoriz[e] the reception of and counting of ballots subsequent to the election day fixed by law." *Id.*, at 228, 149 P. 2d, at 117 (Morris, J., concurring); see *id.*, at 229, 149 P. 2d, at 118 (Erickson, J., dissenting in part) ("The majority does not question the right of the legislature to make provision for the counting of ballots which are not received until after election day"). So if *Maddox* is instructive, it is a point in favor of Mississippi's interpretation, not plaintiffs'.

And if plaintiffs accept the premise that interpretations of the election-day statutes from the 1940s are relevant, they are up against more than *Maddox*. During the 1940s, seven other States authorized the receipt of ballots after election day, reflecting the belief that they were free to do so. See Hearings on H. R. 3436 before the House Committee on Election of President, Vice President, and Representatives in Congress, 78th Cong., 1st Sess., 100–104 (1943). Plaintiffs offer no evidence that any of these laws was ever even challenged under the election-day statutes. In addition, the same year that *Maddox* was decided, Congress passed a law providing that "'any extension of time for the receipt of absentee ballots permitted by State laws shall apply'" to special federal war ballots "'cast'" by soldiers. Act of Apr. 1, 1944, 58 Stat. 146. This precursor to UOCAVA suggests that Congress itself did not understand the federal election-day laws to prevent States from setting the deadline for ballot receipt after election day.

Finally, plaintiffs assert that requiring ballots to be received by election day protects election integrity and increases voter confidence in election results. See, *e.g.*, Brief for Republican Respondents 46–48; accord, *post*, at 16–22. As we have said time and again, however, policy arguments are properly directed to legislatures, not courts. See, *e.g.*, *SAS Institute Inc.* v. *Iancu*, 584 U. S. 357, 368 (2018); *BP p.l.c.* v. *Mayor and City Council of Baltimore*, 593 U. S. 230, 245 (2021). The question today is not whether requiring

ballots to be received by election day is a good or bad idea; the question is whether the idea has made its way into the United States Code.

Regardless, plaintiffs' definition of "election" would do little to address the concerns they identify. Plaintiffs and the dissent argue that if we uphold Mississippi's law, States could put party bosses, ballot harvesters, or Uber drivers in charge of collecting ballots. See Brief for Republican Respondents 22; *post*, at 17. Yet this would also be permissible under their interpretation, so long as the ballots are delivered by election day. As the dissent concedes, the relevant statutes regulate "only the timing of election processes, not their manner." *Post*, at 12. So concerns about the "manner" of ballot delivery have nothing to do with this case.

Plaintiffs also stress that Mississippi's law may give rise to the appearance of fraud because election results may appear to flip after election day. See, *e.g.*, Brief for Republican Respondents 47–48; Brief for United States as *Amicus Curiae* 29; accord, *post*, at 20–21. This is a significant concern. See *Democratic National Committee* v. *Wisconsin State Legislature*, 592 U. S. 1039, 1047 (2020) (KAVANAUGH, J., concurring in denial of application to vacate stay) (discussing the "chaos and suspicions of impropriety that can ensue if thousands of absentee ballots flow in after election day and potentially flip the results of an election"). But even under plaintiffs' interpretation, last-minute flips are possible, because the election-day statutes set no deadline for counting ballots or certifying election results. Brief for Respondent Libertarian Party of Mississippi 13.

Election fraud and its appearance are serious issues. Like other such issues, however, they must be addressed through the democratic process. The election-day statutes are proof of concept: When voting on different days in different States sparked allegations of fraud, Congress set a nationally uniform deadline for voting. If varied deadlines

for ballot receipt similarly call for a national solution, the American people must choose it through their elected representatives.

## IV

There is one last, late-breaking matter. For the first time in their reply briefs before the Fifth Circuit, plaintiffs argued that Mississippi's election system violates the election-day statutes because the Postal Service and common carriers allow mail to be recalled. See, *e.g.*, United States Postal Service, Mailing Standards of the United States Postal Service, Domestic Mail Manual §507.5 (Apr. 6, 2026). According to plaintiffs, a voter who regrets her choice after election day may nullify her vote by recalling her ballot from the Postal Service or a common carrier before it is delivered to election officials. And that, plaintiffs insist, means that the electorate's choice is not actually made as of election day.

Plaintiffs have never independently challenged this aspect of Mississippi law. Ballot recall was not the basis for this litigation; it is nowhere mentioned in plaintiffs' complaints. Even now, plaintiffs frame the possibility of post-election-day recall as simply one reason why counting ballots received after election day violates the federal election-day statutes. See, *e.g.*, Brief for Respondent Libertarian Party of Mississippi 12. For its part, Mississippi denies that voters are allowed to recall their ballots. See Brief for Petitioner 41 (citing Miss. Code Ann. §23–15–637(3)). And it does not dispute that post-election-day recall would violate the election-day statutes.

Two principles are important here. First, post-election-day receipt, considered on its own, does not conflict with the election-day statutes. See Part II, *supra.* Second, state law is preempted by the federal election-day statutes only "'so far as the conflict extends.'" *Foster*, 522 U. S., at 69 (quoting *Ex parte Siebold*, 100 U. S. 371, 384 (1880), abrogated

on other grounds by *Glasgow* v. *Moyer*, 225 U. S. 420 (1912)); see *Siebold*, 100 U. S., at 392 (Congress's power to regulate elections "supersede[s]" state law "so far as it is exercised, and no farther").  So even if plaintiffs are right about Mississippi law, they would still lose the challenge they have pressed in this litigation: that post-election-day ballot receipt is itself unlawful.

\*    \*    \*

The Framers recognized the difficulty of crafting election laws "applicable to every probable change in the situation of the country."  The Federalist No. 59, at 362.  So instead of constitutionalizing election law, they decided that "a discretionary power over elections" needed to be lodged "somewhere."  *Ibid.*  Suffice it to say, that power was not lodged in this Court.  The election-day statutes say nothing about ballot receipt, and we cannot add to the words Congress chose.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 24–1260

_____

## MICHAEL WATSON, MISSISSIPPI SECRETARY OF STATE, PETITIONER *v.* REPUBLICAN NATIONAL COMMITTEE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 29, 2026]

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, and with whom JUSTICE KAVANAUGH joins as to all but Parts II–C–2 and III, dissenting.

Federal law designates "the Tuesday next after the first Monday in November" as "election day," 3 U. S. C. §21, and provides that elections for federal office must be held on that date. See 2 U. S. C. §§1, 7; 3 U. S. C. §1. As the Court explains, an election is "the expression of the electorate's choice," *ante*, at 7, but because the electorate is a collective body consisting of many individuals, the way in which it expresses its choice is less straightforward than would be the case if the electorate were a single individual. If the electorate were an individual, it could issue a document declaring that specified men and women were selected to fill the federal offices for which the candidates had competed, but because the electorate is a collective body, it cannot express its selections in that way. Instead, its choices are embodied in the collection of ballots cast by the individuals who make up the electorate. Taken all together, this collection is the equivalent of a single document declaring the winner of each race. This expression of the electorate's choices is conveyed to the responsible election officials when the collection of individual ballots is completed. At that point, the

electorate authoritatively expresses its choices, and what the election-day statutes demand is that this authoritative choice be made on election day. If ballots received after election day are added to the set of ballots that dictate the election's outcome, the electorate's choice does not occur on election day, and the federal election-day statutes are violated.

In this case, we must apply this interpretation of the federal election-day statutes to a Mississippi law that requires state election officials to accept ballots that arrive up to five days after election day. The acceptance of these late-arriving ballots effectively postpones the date on which the electorate's choice is made, and federal law precludes that postponement.

For this reason, I would affirm the decision below, which held that the provision of Mississippi law requiring acceptance of late ballots violates federal law. Because the Court reverses that decision based on a flawed understanding of the election-day statutes, I respectfully dissent.

## I

For more than 100 years, federal law has designated "the Tuesday next after the first Monday in November" as the day on which United States Senators and Members of the House of Representatives are "elected."[1] See 2 U. S. C. §7 (setting that date as "the day for the election" of Members of the House of Representatives); §1 (United States Senators "shall be elected" on that same date). Similarly, federal law has long provided that the "electors of President and Vice President shall be appointed" on that date as well. 3 U. S. C. §1.[2] And because the appointment of electors in each State is now decided by popular vote, voters express their preferences for President on that same date.

–––––––––––––
[1] See 17 Stat. 28 (Representatives); 38 Stat. 384 (Senators).
[2] See 5 Stat. 721.

Mississippi law allows some voters to cast absentee ballots, Miss. Code Ann. §23–15–713 (Cum. Supp. 2025), and provides that voters may submit these ballots to election officials by mail or common carrier, §23–15–637(1)(a). To be counted, absentee ballots must be postmarked by election day, and state officials must receive them no later than five days "after the election." *Ibid.* Ballots arriving after that date "shall not be counted." *Ibid.* The question we must decide is whether the provision allowing receipt of absentee votes after election day is consistent with federal law.

## II

### A

As noted, the federal election-day statutes provide that elections for federal office must occur on a specified date, "the Tuesday next after the first Monday in November." This may seem like a simple rule, but we must address several issues to understand exactly what it means. The first is the meaning of the term "election" as used in the election-day statutes. The majority states that the term "election" means "the expression of the electorate's choice," *ante*, at 7, and I agree with that definition.

The second issue is the identification of the acts that constitute the electorate's expression of its choice, and those acts are the final submission and collection of ballots. These acts must therefore occur on election day.

That is what the election-day statutes required when all voting occurred in person, and the same requirement applies today. Back when all voting occurred in person, the voters went to the polls on election day. They then completed ballots and turned them over to election officials. When the polls closed, those officials had in their possession a fixed collection of ballots, and taken together, those ballots embodied the electorate's collective choice. That expression of the electorate's choice having been made, the

election-day statutes did not require that anything more be done before midnight on election day. Of course, no one could know the outcome of the election until those ballots were examined and the valid ballots were counted, but it was not necessary for those steps to be finished on election day because the electorate's choices had been authoritatively expressed.

Today, not all voting occurs in person on election day. Both voting by mail and early voting have become popular, and respondents do not dispute the lawfulness of these modern practices. Nor do I. But acceptance of these practices cannot change the fact that under federal law, the electorate's collective choice must still be authoritatively expressed on election day.

That requirement is met in a jurisdiction with mail voting or early voting provided that the critical act occurs on election day: the completion of the collection of the ballots that embody the electorate's collective choice. That is what took place when all voting was done in person, and compliance with the election-day statutes demands that the same occur in a modern election.

The Court disagrees and concludes that the election-day statutes merely require that each individual cast a vote on or before election day. See *ante*, at 9. But if that is all that the election-day statutes require, there is no sense in which the electorate as a whole can be seen as making its choice *on* election day. Rather, the electorate's choice would be made piecemeal over an extended period prior to election day, and that prospect is blatantly contrary to what the election-day statutes demand.

Election day is a specified date, not a span of multiple days. The election-day statutes require that federal elections occur *on* that date. Under the challenged Mississippi law, however, the collection of ballots continues for five more days, and therefore the "election" is not held until the end of that period. Because federal law requires that the

election occur *on* election day, it preempts Mississippi's statute.

B

This conclusion finds support in legal authorities from the period when the federal election-day statutes were enacted. Legal dictionaries of the era described an "election" as including both the casting and receipt of ballots. See 1 J. Bouvier, Law Dictionary and Concise Encyclopedia 979 (8th ed. 1914) ("the act of casting and receiving the ballots"); W. Anderson, A Dictionary of Law 394 (1889) ("[v]oting and taking the votes"). Contemporary state statutes likewise provided that an "election" was not "finished" or "closed" until polls closed, by which point poll workers stopped accepting ballots. *E.g.*, Tenn. Code §§860–861 (1858); Del. Rev. Stat., ch. 18, §§21, 22 (1874); N. C. Code, ch. 16, §2689 (1883). Indeed, under 19th-century election-law parlance, a voter's presentation of a complete ballot constituted a mere "offe[r] to vote," and it was not said that the person had "voted" until an election official took custody of the ballot. *E.g.*, Cal. Pol. Code §§1225–1228 (1876); Md. Pub. Gen. Laws Art. 5, §15 (1878).

State-court decisions from the era corroborate this interpretation. When statutes pegged certain legal consequences to an "election" or "voting," courts held that ballot receipt triggered these consequences. For example, a Pennsylvania court held that a 10-day limitations period for contesting the outcome of a race began running once officials closed the polls on election night, a process that entailed sealing the ballot boxes shut. *Collings's Case*, 2 Luz. L. Obs. 57 (Pa. Quar. Sess. 1861); Act of July 2, 1839, §§72–74, 1841 Purdon's Dig. L. Pa. 351. Similarly, when the Supreme Court of Alabama resolved a charge that a defendant illegally voted, the court held that the defendant could not be found liable unless there was evidence that his ballot had been received by a poll worker and placed in the ballot box.

*Blackwell* v. *Thompson*, 2 Stew. & P. 348, 352 (1832).  As that court put it, "the act of voting is not complete" if "the ballot [is] not received."  *Ibid*.; accord, *Goodell* v. *Judith Basin Cty.*, 70 Mont. 222, 234, 224 P. 1110, 1113 (1924) ("under the authorities generally, the act of voting is not completed until the ballot is deposited in the ballot box").  Accordingly, if a State accepts ballots after election day, then the State extends "the period of voting," and therefore the "election," past that date.  *Ante*, at 7 (internal quotation marks omitted; emphasis deleted).  A 19th-century statute that requires an "election" to occur on a particular day thus requires that the State receive all ballots by that date.

## C

### 1

Two centuries of historical practice reinforce the proposition that holding an "election" on a particular day means that poll workers had to receive the ballots by that date.  From this country's founding until the late 20th century, election-day ballot collection was the near-uniform practice, with only a few, late-arriving exceptions.

Before the Civil War, nearly all voting occurred in person at polling places, so election day was *ipso facto* the day on which poll workers collected all the ballots.[3]  P. Steinbicker, Absentee Voting in the United States, 32 Am. Pol. Sci. Rev. 898 (1938).

This practice did not falter when the cannons rang out at Fort Sumter.  Even when the Civil War took soldiers hundreds of miles from their usual polling places, election day still meant ballot-collection day.  States took different approaches to ensure that their soldiers could vote while away

_____

[3] This was true even in the two States that authorized absentee voting for soldiers in the 1810s.  For Pennsylvania and New Jersey, military officers would serve as election judges and inspectors in the field and collect ballots from their States' soldiers on election day.  See 1813 Pa. Laws pp. 213–215; 1814 N. J. Laws pp. 16–18.

from home. Some States allowed soldiers to mail their ballots back home, either directly to local officials or to proxies who would cast them at the polls. *E.g.*, 1863 W. Va. Acts pp. 119–120; 1864 N. Y. Laws pp. 549–551. Others sent commissioners to soldiers' camps to distribute absentee ballots, collect them, and then deliver them to officials in each soldier's hometown. *E.g.*, 1864 Conn. Pub. Acts pp. 52–53. A third group of States tasked military officers with administering polling places in the field, complete with ballot boxes and voter-registration lists. On this model, officers collected ballots, checked names off lists, counted votes, and, for some States, even took oaths as election officials. *E.g.*, 1866 Nev. Stats. p. 215; 1864 Kan. Sess. Laws pp. 102–103. Critically, regardless of the method a State used, each State continued to mandate that poll workers, whether on the field or "back home," received soldiers' ballots by election day.[4] *E.g.*, 1863 W. Va. Acts p. 120 (requiring that election officials count a mailed-in vote if "received . . . on or before the day of election"); 1866 Nev. Stats. p. 215 (mandating that field-voting polls be open from 8 a.m. to sunset "on the day of election").

The practice of collecting all ballots by election day persisted into the 20th century. To be sure, there were some departures from this norm in the years after Congress

---

[4] The majority questions whether it is defensible to treat ballots in field-voting regimes as "received" as soon as military officers collected them on election day, especially since some States did not formally deputize officers as election officials. *Ante*, at 11, n. 4. Regardless of whether such officers were "deputized," however, these officers (unlike a postal worker) often performed the same kinds of functions that poll workers performed back at local polling places. Compare 1866 Nev. Stats. pp. 214, 216–217, with *id.*, at 215. It is therefore reasonable to conclude that ballots were "received" on election day in field-voting systems. Indeed, the majority describes field voting in this way just one footnote earlier. See *ante*, at 11, n. 3 (noting that "ballot casting and ballot receipt" in field-voting systems occurred "simultaneous[ly]" on election day).

enacted the final election-day statute.  During the World Wars, for instance, Congress and at least nine States allowed absentee ballots to arrive after election day in certain situations.  See, *e.g.*, 1918 Md. Laws p. 130; 58 Stat. 146 (noting that "any extension of time for the receipt of absentee ballots permitted by State laws shall apply" to federal "war ballot[s]" in World War II).  Yet that practice returned to the margins within a few decades.  By 1977, a report from the Department of Defense listed only two States as still allowing ballots to arrive after election day.  See Overseas Absentee Voting: Hearing on S. 703 before the Senate Committee on Rules and Administration, 95th Cong., 1st Sess., 33–34 (1977).  These short-lived outlier rules thus shed little light on the original meaning of "election" in the election-day statutes.

Likewise, although post-election-day deadlines have become more widespread in the last five decades,[5] these developments postdate the last election-day statute by over 50 years and the first statute by over a century.  These late-in-time practices therefore count for little when discerning the timing restrictions that Congress imposed when it enacted those statutes.  See *Pung* v. *Isabella County*, 609 U. S. ___, ___ (2026) (slip op., at 6).

In sum, from this Nation's founding until the last few decades of the 20th century—a period that spans the enactment of all three election-day statutes—having an "election" on a particular day meant completing ballot collection on that day.

_____

[5] See National Conference of State Legislatures, Table 11: Receipt and Postmark Deadlines for Absentee/Mail Ballots (May 18, 2026), https:// www.ncsl.org/elections-and-campaigns/table-11-receipt-and-postmark-deadlines-for-absentee-mail-ballots (archived at https://perma.cc/6NB3-GPGY).

2

The majority brushes aside this impressive historical record because respondents have not offered direct evidence that state actors believed that federal law required these often-burdensome procedures and timelines. *Ante*, at 12–13. For all we know, the majority reasons, the States might have insisted on receiving ballots by election day for their own independent reasons. *Ibid*.

This argument withers on examination, especially as applied to Civil War practices. The States were acutely aware of the federal election-day statutes, and they abandoned practices that they had previously used and presumably preferred in order to comply with them. As the majority notes, before 1845, States had "total control over the timing" of elections for the House of Representatives and substantial leeway to select the date on which voters chose Presidential electors. *Ante*, at 2. States took advantage of this freedom by holding elections on a variety of dates. *Ibid*. After 1845, however, States abandoned the practices they previously preferred and held elections on the date Congress specified. *Ibid*. The majority's argument therefore boils down to this: States complied with what they understood the federal election-day statutes to require; they did not believe that those laws required that ballots be received by election day; but they nevertheless eschewed the freedom they had asserted before 1845 and voluntarily imposed extraordinary burdens on soldiers and election officials during the Civil War to ensure that ballots were received by the federally imposed election day. And they did all this, the majority speculates, because "extending the deadline" for the receipt of ballots "might not have even occurred to them." *Ante*, at 13.

To say that this is not the most likely explanation of States' thought processes would be "a delicately put understatement." *Ante*, at 12. The notion that extending ballot-receipt deadlines for soldiers might never have crossed the

minds of legislators during the Civil War is hard to take seriously. States valued their uniformed citizens' right to vote and wanted to ensure that soldiers had a voice in selecting the officials who would direct the deadly conflict in which they were engaged.[6] See, *e.g.*, 1864 Ky. Acts p. 122 (conferring on soldiers a statutory right to vote "as fully as if such [soldiers] were present" at their usual polling place on election day); 1864 N. H. Laws p. 3061 (similar). And States surely knew that it would take time for ballots to make their way from the front lines back to soldiers' home precincts. States likewise knew that the alternative approach of requiring soldiers to simulate polling places in the field on election day would be burdensome amid ongoing military engagements. Most importantly, States knew how to extend deadlines or grant exemptions to accommodate soldiers whose active service in the Civil War made it difficult for them to fulfill their civic and legal duties. See, *e.g.*, 1862 Ky. Acts p. 67 (giving soldiers up to an extra year to file an answer in pending civil actions); 1861 Wis. Laws ch. 309, p. 319 (suspending civil proceedings in cases where the defendant is serving in the military); 1862 Conn. Pub. Acts p. 74 (exempting soldiers from various state taxes for five years following honorable discharge); 1865 Minn. Laws pp. 58–59 (exempting soldiers from service of civil process and tolling statutes of limitations for claims against soldiers). Given these examples, it strains credulity to suggest that the thought of extending ballot-receipt deadlines simply never occurred to any State during the Civil War.

In any event, the majority does not explain what sort of evidence respondents would need to offer in order to "precisely tie" the States' practices "to the text of the election-day statutes." *Ante*, at 12 (internal quotation marks

––––––––––

[6] It is irrelevant to the question presented that some States did not adopt absentee voting in the Civil War at all. Contra, *ante*, at 12, n. 5. What is relevant is that, where States did endeavor to protect soldiers' ability to vote, States required that ballots be received by election day.

omitted). Readers are left guessing what kind of evidence suffices. Perhaps the majority is looking for legislative floor statements or committee reports stating: "We would really like to give the boys in the field some extra time for their ballots to arrive, but alas, the Presidential Election Day Act of 1845 prohibits us from doing so." But see *FS Credit Opportunities Corp.* v. *Saba Capital Master Fund, Ltd.*, 608 U. S. \_\_\_, \_\_\_–\_\_\_ (2026) (slip op., at 11–12) (discounting the probative value of such evidence). Regardless, the majority places the burden on the wrong side. Given the infeasibility of the majority's alternative explanations for States' Civil War absentee-voting practices, it would be more appropriate to demand floor statements or a committee report stating: "We don't think the federal election-day law requires the receipt of ballots by election day, but we will nevertheless relinquish our previously asserted freedom over the timing of elections and voluntarily take on the burden and expense of ensuring that the ballots of our embattled boys on far-flung battlefields and camps arrive here by the end of election day." Mississippi offers no evidence of this sort. More important, Mississippi does not identify a single State that accepted late-arriving ballots during the Civil War even though States had strong logistical incentives to be lenient on this point.

The majority separately worries that using historical practice to interpret the phrase "election" might "tra[p]" States' election practices "in amber." *Ante*, at 14 (internal quotation marks omitted). But the policy of collecting all ballots by election day is entirely consistent with—indeed, is compelled by—the text, context, and history of the election-day statutes, and one reason for codifying legal rules in a statute is to "trap" those rules "in amber" until they are amended. Moreover, the majority's worries are exaggerated. All agree that the relevant provisions of the election-day statutes regulate only "the time of the election." *Ante*, at 6 (quoting *Foster* v. *Love*, 522 U. S. 67, 71–72 (1997)). So

to the extent that historical practice informs the interpretation of these statutes, it informs only the timing of election processes, not their manner.  See also U. S. Const., Art. II, §1, cl. 2 (giving Congress the power to regulate the timing of States' Presidential elections, but not their manner).  One may rely on historical practice to conclude that ballots must arrive by election day without committing to the view that States must retain every trapping of 19th-century elections.

In short, although the majority attempts to fend off two centuries of American election practice, the takeaway from this history is clear.  When Congress enacted the three election-day statutes, having the "election" on a particular date meant that ballots would be collected by that date.

## D

Having considered text, legal context, and historical practice, I turn to precedent.  Although few judicial decisions interpret the election-day statutes, those precedents favor respondents' position.

The most on-point precedent is the Supreme Court of Montana's 1944 decision in *Maddox* v. *Board of State Canvassers*, 116 Mont. 217, 149 P. 2d 112.  *Maddox* concerned a Montana statute that allowed the State's servicemembers to vote absentee in federal elections as long as officials received their ballots by the fourth Monday in December, several weeks after election day.  *Id.*, at 221, 149 P. 2d, at 114; 1943 Mont. Laws p. 172.  The Montana court held that "in so far as [that provision] purports to extend beyond the election day the time within which voters' ballots may be received by the election officials . . . it is in conflict" with the federal election-day statutes.  116 Mont., at 224, 149 P. 2d, at 115.  Consistent with the election-law principles discussed above, the court recognized that a ballot was not "cast" until election officials received it.  *Id.*, at 223–224, 149 P. 2d, at 115; see *supra*, at 5–6.  And because federal

law "requires the electing to be done on election day," the court held that Montana's post-election-day deadlines were preempted. 116 Mont., at 224, 149 P. 2d, at 115. Thus, the only other high-court decision to address the question presented favors respondents' position.

The majority casts aside *Maddox* on two unpersuasive grounds. First, the majority suggests that *Maddox* turned on state law. *Ante*, at 18. But *Maddox* cited federal law and Congress's constitutional powers under the Elections and Electors Appointment Clauses in holding that Montana's ballot-receipt rules were "in conflict with" a "congressional Act." 116 Mont., at 224, 149 P. 2d, at 115; see also *id.*, at 222, 149 P. 2d, at 114 (explaining that "states have no power to interfere" with the federal election-day statutes). That state law also dictated the same conclusion does not diminish the court's federal-law analysis.

Second, the majority highlights that a one-Justice concurrence and a one-Justice dissent did not read *Maddox* as foreclosing post-election-day ballot receipt. *Ante,* at 19. But separate writings are "generally not the best source of legal advice" on the scope of a court's holding, *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 230 (2023), and that principle is particularly applicable here. Neither separate opinion discussed federal law at all, and the concurrence objected to post-election-day ballot receipt even more strongly than did the majority opinion. See 116 Mont., at 229, 149 P. 2d, at 117 (Morris, J., concurring) (predicting that accepting ballots after election day would be "almost universally condemned"); *id.*, at 229–232, 149 P. 2d, at 117–119 (Erickson, J., dissenting in part).

Consider next our decision in *Foster* v. *Love*, 522 U. S. 67. There, this Court concluded that the election-day statutes preempted an arrangement under which a congressional candidate who performed well enough in a primary could win election to office outright without facing a further

contest.  In invalidating this arrangement, *Foster* held that the election-day statutes' use of the word "election" meant the "combined action of voters and officials meant to make a final selection of an officeholder."  *Id*., at 71.  So, although *Foster* did not "isolat[e] precisely what acts a State must cause to be done on federal election day," *id*., at 72, the Court did contemplate that the election-day statutes require more than just unilateral voter action.  In other words, *Foster* explained that an "election" does not occur on election day unless both voters *and* officials play a role.

The majority contravenes this portion of *Foster* by holding that a State satisfies the election-day statutes so long as voters complete their part of the electoral process (*i.e.*, putting ballots in mailboxes), even if officials do not take their first steps in effectuating the "final selection" of a candidate (*i.e.*, receiving ballots) until days or weeks later.[7] Thus, *Foster* cuts against the majority's position.

### III

The majority's remaining arguments are patently insufficient to overcome what text, context, history, and precedent establish.  First, the majority notes that several provisions of the Uniformed and Overseas Citizens Absentee Voting Act of 1986 (UOCAVA) cross-reference state-law deadlines for ballot receipt.  See, *e.g.*, 52 U. S. C. §20303(b)(3).  The majority next invokes the interpretive canon that counsels in favor of reading statutes in a way

---

[7]The majority maintains that it honors *Foster*'s "combined action" definition.  In the majority's view, States may satisfy that definition by "establishing the rules for the election" or "providing ballots" in the lead-up to election day. *Ante*, at 18.  But the majority's view leads to implausible outcomes.  On the majority's reading of *Foster*, as soon as States have "provid[ed] ballots" and absentee voters have bubbled them in, there has been "combined actions of voters and officials . . . to make a final selection," even if voters do not submit their ballots in the mail until weeks later.  See *Republican Nat. Comm.* v. *Wetzel*, 120 F. 4th 200, 207 (CA5 2024) (offering similar hypotheticals).

that accommodates later legislative enactments. *Ante*, at 7–8; see *West Virginia Univ. Hospitals, Inc.* v. *Casey*, 499 U. S. 83, 100–101 (1991) (noting that this substantive canon does not reveal "what the lawmakers must have had in mind" but rather advances the normative value of consistency across the U. S. Code). The majority then concludes that the election-day statutes must not impose federal ballot-receipt deadlines because UOCAVA's cross-references to state-law deadlines "would make little sense" otherwise. *Ante*, at 8.

This argument falters. In any statutory-interpretation case, a court's goal is to determine what the statute meant at the time it became law. See A. Scalia & B. Garner, Reading Law 78 (2012). Statutes enacted decades after the fact are seldom probative of this meaning. See *West Virginia Univ. Hospitals*, 499 U. S., at 100–101 ("how could an earlier Congress know what a later Congress would enact?"). The threshold for interpreting a later-enacted statute as controlling is accordingly steep: A litigant must show that such an interpretation is necessary to avoid making "nonsense out of the *corpus juris*." *Id.*, at 101. That showing is not satisfied here. It is easy to make sense of UOCAVA's cross-references to state-law ballot-receipt deadlines without eschewing a federal election-day deadline. As the majority acknowledges, UOCAVA applies to primaries, which are not subject to the election-day statutes at all. See *ante*, at 16. For those elections, state law supplies the only ballot-receipt deadlines, so UOCAVA's cross-references to them make perfect sense even if the election-day statutes set a federal deadline for general elections.[8] The majority contends that this interpretation "does not work" because UOCAVA does not distinguish between these kinds of

---

[8]Additionally, when Congress enacted UOCAVA, at least one State had a pre-election-day deadline. See 1986 Miss. Laws p. 832. Thus, UOCAVA's cross-references could also reflect the fact that States can set earlier deadlines.

elections. *Ibid.* But that detail does not suffice to render UOCAVA's cross-references "nonsense," as would be needed for this Court to treat UOCAVA as controlling our interpretation. Because respondents have shown that UOCAVA can be sensibly squared with their interpretation of the election-day statutes, UOCAVA does not foreclose their position. [9]

The majority separately suggests that an election-day ballot-receipt deadline would call into question the validity of early voting, as early-arriving ballots would not be received *on* election day. *Ante*, at 14. But, to reiterate, it is the electorate's decision, not the voter's, that constitutes the "election." And no matter when a State receives voters' individual ballots, the electorate's choice is not made until all ballots have been cast and collected. So long as that occurs on the Tuesday after the first Monday in November, the election-day statutes are satisfied.

## IV

Not only is today's decision inconsistent with statutory text, legal context, historical practice, and precedent; it also threatens to produce lamentable consequences. The majority's holding spawns a slurry of troubling election-law questions and risks further undermining Americans' confidence in election integrity.

## A

The majority holds that a State complies with the federal election-day statutes if it requires that ballots are postmarked by election day and received within five days after. But this ostensibly simple holding obfuscates the many

---

[9] The majority further argues that respondents' proposed reconciliation fails because one section of UOCAVA applies to general elections only. *Ante*, at 16–17 (citing 52 U. S. C. §20304(b)(1)). But that section of UOCAVA, unlike others, does not cross-reference state-law deadlines at all.

unsettling questions that the majority's position entails. For instance, do the federal election-day statutes impose *any* ballot-receipt deadlines? Mississippi counts absentee ballots that arrive up to five days after the federal election day, but nothing in the majority opinion turns on that 5-day duration. Indeed, some States will count mail-in ballots that arrive as late as 21 days after election day. See Wash. Rev. Code §29A.60.190 (2025). If the "election" is complete when voters fill out their ballots and send them on their way, may States eliminate ballot-receipt deadlines entirely? It appears that the only federal backstops for ballot receipt are the date when newly elected Representatives and Senators must report for their swearing in and the date when Presidential electors must cast their votes.

Next, would it suffice under federal law if a State authorized voters to tender their ballots to any third party by election day? Mississippi counts late-arriving absentee ballots only if they are sent using the Postal Service or a common carrier. Miss. Code Ann. §23–15–637(1)(a). But nothing in the election-day statutes gives those entities special treatment. Could a State therefore count late-arriving ballots if they are delivered by some other intermediary? How about a relative of the voter? A helpful neighbor? An Uber driver who agrees to serve as a courier?[10] A "ballot harvester" affiliated with a political party or interest group? See *ante*, at 20 (not disputing that the election-day statutes would allow a regime where voters could give their ballots to these intermediaries on election day for later delivery).

May States use something other than a ballot's postmark to determine when someone voted? Mississippi requires that an absentee ballot be postmarked on or before election day, but other States do not. See, *e.g.*, Cal. Elec. Code Ann. §3020(b)(2) (West Supp. 2026) (relying on the date that a

―――――――――

[10] See Uber Courier, https://www.uber.com/us/en/item-delivery/ (archived at https://perma.cc/HPE6-6YWZ).

voter signed the ballot envelope). Do those States' laws comply with the election-day statutes? What happens if a voter deposits a ballot in a U. S. mailbox on election day after the last mail pickup for the day?

What happens if a courier offers a recall service? The majority's rule apparently rests on the notion that a voter has made a "final *selection* of an officeholder" once the voter tenders a ballot to the party who will deliver it. *Ante*, at 7 (quoting *Foster*, 522 U. S., at 71). But the Postal Service allows its customers to recall mail mid-transit, as do many private parcel services. See, *e.g.*, United States Postal Service, Mailing Standards of the United States Postal Service, Domestic Mail Manual §507.5 (Apr. 6, 2026). Given that fact, is a voter's "selection" truly "final" when he or she puts a ballot in the mailbox? The majority dodges this question, offering the passing suggestion that Mississippi's statute would be preempted only insofar as it allows voters to recall their ballots. *Ante*, at 21–22. May the Fifth Circuit hold as much on remand? Must state law expressly prohibit voters from using recall services? Do the Postal Service's or FedEx's mail-recall policies violate the election-day statutes as applied to absentee ballots?

For state legislatures trying to understand what the election-day statutes allow, the majority's decision opens Pandora's box.

B

Finally, today's decision leaves open opportunities for voter fraud that may further undermine Americans' faith in the integrity of this country's elections. Diverse sources have recognized that mail-in ballots increase the potential for fraud. In 2005, a committee chaired by former President Jimmy Carter and former Secretary of State James Baker found that absentee voting was "the largest source of potential voter fraud" in American elections. Commission on Federal Election Reform, Building Confidence in U. S.

Elections 46 (Sept. 2005). Likewise, in *Crawford* v. *Marion County Election Bd.*, 553 U. S. 181 (2008), Justice Stevens recognized that the risk of voter fraud "perpetrated using absentee ballots" is "real" and "could affect the outcome of a close election." *Id.*, at 195–196 (lead opinion). Some *amici* in that case similarly explained that when voter fraud occurs these days, it "generally takes the form of organized fraud such as . . . use of fraudulent absentee or mail-in ballots."[11] Brief for Brennan Center for Justice et al. as *Amici Curiae*, O. T. 2007, No. 07–21 etc., p. 19 (citing L. Minnite & D. Callahan, Securing the Vote: An Analysis of Election Fraud 14–15 (2003)).

It is not difficult to understand why. When someone votes by mail, it is harder for officials to verify the identity

––––––––––

[11] Examples of voter fraud using absentee ballots in recent decades are not hard to come by. See, *e.g.*, North Carolina State Board of Elections, State Board Unanimously Orders New Election in 9th Congressional District (Feb. 25, 2019), https://www.ncsbe.gov/news/press-releases/2019 /02/25/state-board-unanimously-orders-new-election-9th-congressional-district (archived at https://perma.cc/7QFU-RYL4) (ordering a new congressional election after discovering a "coordinated, unlawful and substantially resourced absentee ballot scheme" in a 2018 race (internal quotation marks omitted)); *United States* v. *McCranie*, 169 F. 3d 723, 724–726 (CA11 1999) (detailing how Georgia courts had voided an election after finding "widespread" absentee-ballot fraud involving vote buying, vote selling, multiple voting, felon voting, and deceased-person voting); *In re Protest of Election Returns and Absentee Ballots in Nov. 4, 1997 Election for City of Miami*, 707 So. 2d 1170, 1172, 1174 (Fla. App. 1998) (*per curiam*) (voiding all absentee ballots cast in an election because "massive absentee voter fraud . . . literally and figuratively . . . stole the ballot from the hands of every honest voter in the City of Miami" (internal quotation marks omitted)); *Pabey* v. *Pastrick*, 816 N. E. 2d 1138, 1154 (Ind. 2004) (finding "pervasive and widespread deliberate conduct that perverted the absentee voting process and compromised the integrity and results of th[e] election" (internal quotation marks omitted)); *Bradley* v. *Perrodin*, 106 Cal. App. 4th 1153, 1165–1170, 131 Cal. Rptr. 2d 402, 412–415 (2003) (affirming the annulment of an election where a candidate fraudulently registered nine non-citizens and helped them illegally vote using absentee ballots).

of the person requesting and completing the ballot. Mail voting also presents a greater opportunity for voter manipulation, a more vulnerable chain of ballot custody, and a diminished ability to detect improprieties in real time.[12] Today's decision compounds these vulnerabilities. Allowing absentee ballots to pour in over the days and weeks after election day, by which point preliminary election returns are being publicly reported, creates greater opportunity for fraud and risks further undermining the public's confidence in election integrity. As JUSTICE KAVANAUGH has explained, when "thousands of absentee ballots flow in after election day and potentially flip the result of an election," "charges of a rigged election can explode." *Democratic National Committee* v. *Wisconsin State Legislature*, 592 U. S. 1039, 1047 (2020) (concurring opinion) (internal quotation marks omitted).

Likewise, it is not difficult to foresee the types of fraught situations that the counting of late mail-in ballots may lead to. Suppose that the outcome in a close Presidential election hangs on the final vote in a State that allows officials to count mail-in ballots received up until two days before its Presidential electors must meet to submit their votes. And suppose that, when all the ballots cast in person are counted by the morning after the election, one of the candidates is ahead by 15,000 votes. As the mail-in ballots arrive and are counted, that lead alternatingly dwindles and swells. By Thanksgiving, the lead of the candidate who has been ahead since election day dips to just 1,500 votes. This figure holds until a few days before the State's electors need

---

[12] See MIT Election Data + Science Lab, Voting by Mail and Absentee Voting, Administrative Issues (Feb. 28, 2024), https://electionlab.mit.edu/research/voting-mail-and-absentee-voting#content-section-113 (archived at https://perma.cc/8WEZ-89T8).

to vote, when one last tranche of mail-in ballots puts the opposing candidate in the lead by, say, 87 votes.[13]

It is not pleasant to imagine what this course of events would mean for popular faith in the integrity of that election and of our electoral process in general. Even in the absence of partisan rhetoric, drawn-out ballot-counting "induces a large, significant decrease" in Americans' trust in elections.[14] By allowing States to continue receiving new ballots during these drawn-out processes, today's decision will only exacerbate voters' distrust.

In response to these concerns, the majority counters that the appearance of fraud could persist under respondents' interpretation of the statute. *Ante*, at 20. But that contention is as nonresponsive as it is unremarkable. No statutory scheme will eliminate concerns about fraud entirely, and nobody claims that an election-day ballot-receipt deadline would do so. Nevertheless, as the majority acknowledges, election-timing laws are one tool that governments have traditionally used to reduce opportunities for voter fraud. *Ante*, at 2–3. Indeed, concerns about fraud were a

_____

[13] This fact pattern is not very far-removed from reality. An acclaimed biography of former President Lyndon Johnson detailed how the Senate campaign that propelled his political career was marred by late-arriving votes that changed the outcome of the race. See generally R. Caro, The Years of Lyndon Johnson: Means of Ascent (1990). In 1948, Johnson eked out a razor-thin victory over his primary opponent in a runoff, all but guaranteeing that he would win the general election in Texas. Johnson's victory was made possible through the election-flipping addition of 202 votes to the tally several days after polls had closed. Two hundred of those late-arriving votes were cast for Johnson, who won the race by just 87 votes. In the decades since, weighty evidence has come to light casting serious doubt on those votes' legitimacy. *Id.*, at xxxi, 316–317, 328–329, 375–402. Although a complete account of what occurred in that election has been lost to history, the incident illustrates the real risks that today's decision entails.

[14] M. Lockhart et al., Voters Distrust Delayed Election Results, But a Prebunking Message Inoculates Against Distrust, 3 PNAS Nexus 1 (2024).

leading cause of the enactment of the federal election-day statutes. *Ibid.*

It is undeniable that a prohibition on counting late-arriving ballots would provide an additional hurdle for bad actors seeking to stuff ballot boxes when early election results suggest a tight race. The majority incorrectly removes this safeguard from federal law.

*    *    *

Today's decision is inconsistent with the terms of the election-day statutes, contemporary election-law principles, two centuries of historical practice, and the case law on the question presented. It opens up and fails to resolve a host of questions for state election officials and courts. And it creates a serious risk of further undermining public confidence in our elections and our system of self-government. I therefore respectfully dissent.